## Lewis & Nelson's Appeal.

1. An Act of Assembly changing the venue of a suit commenced and proceeded in, is constitutional.

2. A provision may be implied in a constitution, but the implication must be very plain and necessary.

3. The legislature possess all legislative power except such as is prohibited by express words or necessary implication.

4. The estoppel of a judgment extends only to the question directly involved in the issue, not to any incidental or collateral matter although it may have arisen and been passed upon.

5. Corbett contracted with Lewis to manufacture from Lewis's timber land and deliver lumber to him at a price named; when a sufficient quantity should be delivered to pay the cost of the land, machinery, expenses, &c., Lewis to convey one-third of the land to Corbett; he refused to deliver lumber on the ground that he had delivered enough to fill the contract; Lewis brought replevin and recovered, Corbett having given a property bond. *Held,* that the verdict was not conclusive on the accounts of the parties, and that the amount of the verdict was a credit to Corbett on the contract.

6. The rule that he who comes into equity must come with clean hands, refers to wilful misconduct.

7. A tenant in common who has contracted to sell the common property with consent of his fellow, is not bound to account for more than he has actually received.

8. In an action between co-tenants, all disbursements for the recovery, defence, or protection of the common property should be allowed; but not law expenses of adverse suits between the tenants themselves.

November 21st 1870. Before THOMPSON, C. J., READ, AGNEW, SHARSWOOD and WILLIAMS, JJ.

Appeal from the Court Common Pleas of *Jefferson county :* In equity, No. 181, to October and November Term 1870.

On the 8th of January 1867, W. W. Corbit filed a bill against Samuel Lewis and William Nelson, in the District Court of Allegheny county.

The bill charged that the defendants having a title, in the manner stated in the bill, to timber land in Jefferson county, it was agreed between them and the plaintiff by two different articles, dated May 28th 1863, that the defendants should furnish the means to build saw-mills and other necessary buildings to manufacture boards and shingles; that the plaintiff should superintend their erection and the manufacturing of the boards and shingles, and running them to market, and when the plaintiff should manufacture and deliver at Pittsburg sufficient lumber, boards at $8 per thousand feet and shingles at $1.75 per thousand, to pay the advances for the lands, buildings, &c., the defendants would convey to him an undivided third of the lands, buildings, &c., the agreement to expire in five years from its date. The bill further averred that the plaintiff completed the buildings in October 1863, and that up to the 1st of October 1864, when he ceased manufacturing lumber on the mills, he had delivered to the defendants about 468,172 feet of boards. The bill further averred that on

[Lewis & Nelson's Appeal.]

the 1st of October, the defendants entered into a parol agreement
with Hill & Jackson, to which the plaintiff assented, for the sale
of the land and mills for $18,000. Hill & Jackson took posses-
sion, and after continuing there about a month, the contract was
rescinded, the defendants alleging that they were not able to make
title. Hill & Jackson surrendered possession to the defendants,
who held it to the exclusion of the plaintiff, and contracted with
Newton Taylor for manufacturing and delivering lumber, without
regard to the plaintiff's rights. Whilst the plaintiff was in pos-
session, being unable, for causes stated, to obtain timber from the
land, he purchased from his own means and manufactured enough
to make 200,000 feet of boards. In the spring of 1865, the plain-
tiff brought to points near Pittsburg 593,685 feet of boards,
including the 200,000 feet of his own. On the 8th of April, he
proposed to Lewis, one of the defendants, to deliver the whole
amount of the lumber, if the defendants would pay the propor-
tionate price of the timber, for which he had himself paid; this
was refused; and the defendants issued a replevin out of the Dis-
trict Court of Allegheny county to take the whole lumber, including
his own 200,000 feet; he gave a claim-property bond, and
retained the lumber, but a judgment for $17,514.30, a sum greater
than all the lumber in his possession, was recovered against him
on the 10th of May 1866, which he believed the defendants intended
to collect from him. The bill further averred that the lands, mills,
&c., cost $12,292.38 ; that the lumber delivered before the replevin
issued was worth $11,703, from which, after deducting $3745, the
amount to be received by the plaintiff for certain expenses, there
would be $7958 to be applied to the cost of the lands and mills,
and there would remain $4334, on payment of which the plaintiff
would be entitled to a deed for one-third of the land and mills
and the lumber manufactured upon them. The bill further aver-
red that a quantity of lumber, to an amount unknown to the plain-
tiff, had been manufactured from the land whilst Hill & Jackson
held possession, and whilst Taylor had it, which the plaintiff
believed, after deducting the expenses of manufacturing, &c.,
would be more than sufficient to pay the cost of lands and mill,
and leave a surplus to be divided, independently of the amount
of the verdict in the replevin. The bill charged that the defend-
ants had recently sold the land and mill to Taylor for $30,000.
He further charged that he was entitled to a deed for one-third
of the land, &c., and to an account for the lumber and moneys
received by plaintiffs both as proceeds of the lumber and the sale
of the land, &c., and that he ought not to be called on to pay the
the verdict in the replevin, until the defendants have come to an
account with him.

The prayers were for an account, that the defendants be enjoined

[Lewis & Nelson's Appeal.]

from collecting the verdict until they have accounted, and for general relief.

On the 16th of February 1867, a preliminary injunction was refused.

On the 10th of April 1867, an Act of Assembly was passed transferring this case to the Court of Common Pleas of Jefferson county to be tried, &c., with same effect as if continued in the District Court of Allegheny, and directing the record, &c., to be certified to Jefferson county.

On the 30th of April the defendants filed their answer. They admitted the agreements as set out in the bill. They averred that the whole amount realized from the lumber manufactured by the plaintiff was $7286.04; that the plaintiff notified them that he would not perform the contract; that they had to pay Hill & Jackson for their expenses and outlay, $100 for disappointment, and $400 for logs which plaintiff represented to be at the mill, but were not; that the plaintiff did not purchase timber with his own money, but if so, no recovery could be had, as it had been determined by the verdict in replevin that he had forfeited his right to the lumber; they admitted the bringing of the lumber to points near Pittsburg, the suit in replevin and the judgment therein, and the cost of land and mill as stated in the bill; they denied the other allegations as to the state of the accounts; they averred that the record in the replevin showed that in addition to $12,292.38, the cost of the land, &c., the defendants had advanced to the plaintiff above $19,000; that the defendants had advanced $32,000, and had received but $7286.04, leaving them out $24,714.02, in addition to costs, expenses, attorney's fees, &c., caused by the acts of the plaintiff; that the plaintiff having cancelled the agreement, and done other acts (specified) prejudicial to the plaintiff, was not entitled to inquire into the sale to Taylor; but they said that they agreed to convey to Taylor the land and mills, upon his delivery to them 1,300,000 feet of lumber, viz., 300,000 feet in the spring of 1867, 300,000 feet in the spring of 1868, 400,000 feet in the spring of 1869, and 300,000 feet in the spring of 1870; they averred that the defendant's conduct in endeavoring to appropriate to his own use the 593,684 feet of lumber, deprived him of the right to an account, and that the verdict in the replevin was a bar to the relief sought; they admitted that the verdict was greater than the value of the lumber, but averred that the excess was for exemplary damages for the fraud he committed on the plaintiffs.

On the 1st of May 1867, the plaintiff filed the Act of Assembly, and moved that the record, &c., of the cause be transferred to Jefferson county. On the 20th of July the court ordered the transfer of the case. The defendants appealed from this order to the Supreme Court. The appeal was there quashed and the record

remitted. The case was then transferred to the Court of Common Pleas of Jefferson county.

On the 7th of December 1867 a replication was filed, and an examiner was appointed. On the report of the examiner the court, November 30th 1869, appointed James Boggs, Esq., master.

The master found the allegations as to the agreements between the plaintiff and defendants substantially as stated in the bill, with the addition that the defendants were to have the entire control of the sale of the lumber until they should have received sufficient to pay all the advances. He further found that up to the fall of 1864 Corbett had manufactured about 1,000,000 feet of boards, part of which he had delivered to Lewis & Nelson during 1864, but about 585,000 feet of which were not run until the spring of 1865.

About the 1st of November 1864, Lewis & Nelson, with consent of Corbett, negotiated a sale of the whole mill property to Hill & Jackson at the price of $18,000; and Hill & Jackson took possession from Corbett, and entered into contract with Alexander Scribner for the manufacture of lumber thereon. Hill & Jackson, at the time they went upon and examined the said premises, represented to Corbett that they had bought the property from Lewis & Nelson, and stated the price at which they had bought, whereupon Corbett passed over to them the possession. They retained the possession of the property about a month, when they surrendered it to Lewis & Nelson, on account of some alleged difficulty in procuring the title for the lands by Lewis & Nelson. The contract with Hill & Jackson was in parol, they paid no money upon it, and with consent of Lewis & Nelson, it was rescinded. Thus far, for aught that appears from the evidence, all their business operations had run smoothly. Lewis & Nelson, at the rescission of the contract with Hill & Jackson, took charge of the mill property, and agreed to carry out the contract between Hill & Jackson and A. Scribner, he having sub-let the mill to Andrew Butler, who manufactured 100,000 feet of lumber that was run and delivered in Pittsburg to Lewis & Nelson.

About the 6th or 7th of April 1865, Corbett arrived in the neighborhood of Pittsburg with the balance of the lumber manufactured by him the previous year (585,000 feet), when, from some dispute or misunderstanding between Lewis & Nelson and himself, the lumber was not delivered; whereupon Lewis & Nelson took out a replevin against Corbett in the District Court of Allegheny county for its recovery. Corbett executed a claim property bond, retained the lumber, and went to trial under the plea of property; the case was determined and a verdict rendered against him on the 9th of November 1865, for $17,514.48.

On the trial of that case the contracts and transactions between

[Lewis & Nelson's Appeal.]

the parties under them were all given in evidence. Lewis & Nelson gave in evidence the aforesaid contracts between themselves and Corbett, of the 28th of May 1863, the several amounts of money, goods, &c., advanced under those contracts, together with evidence of identity of the lumber replevied as having been made upon the said mill.

Corbett, under his plea of property, exhibited and gave in evidence the amounts of money paid out by him about the erection of the mill and other buildings, the purchase of land, and the general cost and expense of the establishment; the quantity of lumber delivered by him to Lewis & Nelson under the contract, and the agreement of sale of the property to Hill & Jackson, &c., and from all these, together with other facts, contended that the advances of Lewis & Nelson had been fully paid and discharged; and that by reason thereof he was entitled to a one-third joint interest of the mill property, and to the exclusive possession of the lumber for which the suit was brought under the stipulations of the said contract, and that therefore the replevin for the lumber ought not to be sustained.

From the original verdict of the jury in that case, given in evidence in this case on part of defence, it appears that the jury found for the plaintiffs for the 585,000 feet of lumber at $27 per thousand, making $15,795, and interest for seven months, $552.82, and damages, $1116.66, making whole amount of the verdict $17,514.48, which amount, together with interest thereon and costs, was subsequently collected from Corbett in full.

Lewis & Nelson still retained the possession, or at least the control of the mill property, and gave a contract to Newton Taylor to stock, saw and deliver the lumber to them, for the consideration of $12.50 per thousand, and under that contract Taylor delivered to them in 1866, 550,000 feet. Subsequently, on the 26th December 1855, they sold the fee-simple of the property to Newton Taylor for the consideration of 1,300,000 feet of boards, to be delivered to them in Pittsburg as set out in the answer. This would be a conversion, and equity would charge the defendants with the actual money value of the personalty thus substituted, at the time receivable under the contract.

The plaintiff claims that the defendant should account in this case for the Pittsburg market value of all the lumber received by them from him, manufactured on this mill, inclusive of the 585,000 feet recovered against him in the action of replevin; as also the same market value of all lumber received by them from the said mill from the date of the surrender of possession thereof by him to Hill & Jackson, until the sale of the property to Newton Taylor, less cost of manufacturing and delivery; and also the like market value of all lumber delivered and deliverable by Taylor under his said contract of purchase. That upon an equit-

[Lewis & Nelson's Appeal.]

able adjustment of all the transactions between the parties, under their contracts, plaintiff contends that he is entitled to a decree in his favor, against defendants for a large amount.

To plaintiff's claim in this case, the defendants have taken two grounds of defence, either of which, it is contended, is fatal to his bill.

1. That the judgment in the action of replevin is a conclusive bar to, and estops the plaintiff's recovery in this case.

2. "That on general equitable principles the plaintiff cannot sustain this bill," and

3. That even if plaintiff can sustain his bill the heavy advances made by them far overbalance any legal or equitable demands to which the plaintiff could reasonably be entitled under the contracts, and would leave a large balance in their favor. * * *

The master as to the 1st point after discussing the law elaborately and citing numerous authorities, said:—

"It was doubtless necessary for the jury to take and state some kind of an account between the parties in the replevin suit, in order to ascertain whether or not the advances were paid by delivery of lumber under the contract or otherwise. And that was the only fact they could find as to that point of the case, and that was collateral to the real issue under the pleadings. It would have been all the same if they had found one dollar of the advances unsatisfied, or one thousand, or five thousand. The one would have been as effectual as the other in settling the right of property in the lumber, and consequently the action. Again, if the jury in that case had found from a statement of account between the parties, that the advances had been paid and overpaid, the only thing they could have found, would have been for the defendant generally, and in no way could they have found a money judgment so as to settle the accounts between the parties.

"It seems to me, after a very full and careful examination of the authorities, that in order to make a former judgment a bar, it should comprehend the cause of action in the case in which it is offered—should cover the whole ground of controversy between parties in the latter case.

"The judgment in the replevin case is conclusive between the parties, for its own proper purpose and object. Under the pleadings, it decided that 585,000 feet of lumber replevied, rightfully belonged to Lewis & Nelson under the contract. It could not give them the lumber itself, but it gave them the market price, the same that they would have received if the lumber had been delivered under the contract; $27.00 per thousand for 585,000, making $15,795.00

With seven months interest,    .    .    .    .    .        559.82
And damages for detention,    .    .    .    .    .    1,166.66

Making in all the amount of the verdict,    .    .      17,514.48

For which judgment was entered against Corbett and subsequently paid by him.

" The judgment in replevin put Lewis & Nelson and Corbett in the same condition they would have been in if Corbett had delivered the lumber under the contract : or if he had delivered the lumber and prevented the replevin.

" The judgment in the replevin settled nothing between the parties, but the right of property and possession of the lumber for which the suit was brought, under the contract; that was the gist of the action; upon that, under the pleadings, the judgment was entered; and so far and no farther is it conclusive between these parties. In that view, the merits of this case are entirely outside of and unaffected by the judgment in the replevin, and therefore the plaintiff's bill can be sustained.

" We come now to defendant's second position : ' That on general equitable principles the plaintiff cannot sustain his bill.'

" It is argued on part of defence, that Corbett cannot claim a specific performance of his contract with Lewis & Nelson, because he violated that contract by refusal to deliver the lumber, and because he failed to execute his contract by manufacturing and delivering lumber under it until the advances were paid up. But here it becomes necessary for us to turn our attention to the facts, in order to ascertain the standing of the parties then to that contract.

" About the 6th of April, 1865, Corbett arrived in Pittsburg with the lumber at that time replevied.

" In the fall of 1864, Lewis & Nelson and Corbett mutually sold the mill property to Hill & Jackson, and Corbett delivered over to them the possession. Hill & Jackson entered into a contract with Scribner to stock the mill and manufacture lumber; and Scribner sub-let the mill to Butler, who proceeded and manufactured, the same fall, 100,000 feet of lumber; all done under and in pursuance of the sale to Hill & Jackson and their agreement with Scribner; and that lumber, the next spring, delivered to Lewis & Nelson.

" What effect had all those proceedings upon the Lewis, Nelson and Corbett contract ?

" I apprehend, that the mutual agreement of the parties to sell to Hill & Jackson, was a mutual waiver of any further execution of the contract, at least so far as the manufacturing and delivery of lumber in satisfaction of the advances, and the execution of a deed by Lewis & Nelson to Corbett for the undivided one-third of the land, were concerned. And in the absence of any stipulation on that subject, I apprehend, that equity would have applied the consideration money of the Hill & Jackson sale, first in extinguishment of any balance of advances that might have been unsatisfied; and secondly, would have divided

the balance between Lewis & Nelson and Corbett according to their respective rights under the contract.

" But the contract of sale to Hill & Jackson was rescinded, or not executed, and no money paid on it. At the rescission of that contract, Lewis & Nelson agreed to carry out and perform the contract between Hill & Jackson and Scribner. And under *that* contract Butler manufactured and had delivered to Lewis & Nelson, 100,000 feet of lumber. Corbett never had the possession after delivery of it to Hill & Jackson, but there is some evidence that he was consulted as to the rescission of the Hill & Jackson contract. * * *

" Newton Taylor took possession of the property from Butler, under a contract with Lewis & Nelson to manufacture and deliver the lumber to them at $12.50 per thousand. Under that contract Newton Taylor delivered, in the spring and summer of 1866, 600,000 feet, and on the 26th of December 1865, had purchased the fee simple of the property from Lewis & Nelson, for the consideration above stated.

" Certainly the rescission of the Hill & Jackson contract, would not revive the original contract between Lewis, Nelson and Corbett, in so far as its execution had been mutually waived by the parties. How then did the parties stand with reference to the mill property? And here it is contended on part of the defence, that Corbett had no rights, except upon the performance of his individual covenants. But even if that were conceded, the argument would not apply here, if, after a partial performance, further performance was waived. Besides that, in the replevin case between these parties, the Supreme Court say, " beyond all doubt, Corbett acquired an equitable estate in the lands, &c., to be perfected by a conveyance of the legal title to an undivided third of the premises at such time as he should have manufactured, in the manner provided, and delivered to Lewis & Nelson, boards and shingles sufficient to pay the cost of saw-mills and manufacturing." Any other view would be inequitable. For it is not any where alleged in the case, that Corbett did not fully perform his covenants down to the waiver of further performance, by the sale to Hill & Jackson. Then unquestionably upon the rescission of the contract with Hill & Jackson, the property would revert to the parties; the legal title to Lewis & Nelson and the equitable title to the undivided third to Corbett.

And at this juncture of their affairs, Lewis & Nelson having assumed the entire control of the premises, entered into contracts for the manufacture and delivery of lumber; and finally sold the fee simple of the premises, and converted and appropriated the proceeds arising therefrom, without consulting Corbett upon the subject; I apprehend that equity would apply the net funds so realized, so as to do no injustice between the parties: First to the

extinguishment of any balance of advances remaining unpaid, and next to Lewis, Nelson and Corbett themselves, in equal thirds, upon the basis of the contract.

" However it is claimed on part of defence, that the non-delivery of the 585,000 feet of lumber by Corbett, should prevent his recovery in this case. But by the determination of the replevin case, Lewis & Nelson have received a complete substitute in lieu of the lumber, by a judgment for its market value with interest, and also damages for the wrong of the detention under the contract. And so far I view that judgment as conclusive between the parties.

" From the view taken of this case thus far, it is unnecessary to consider the prayer in the bill for a decree for a deed." * * *

The master stated an account to April 9th 1870, the date of this report.

The account comprised numerous items making the results hereafter stated, viz. :

| | |
|---|---:|
| Received by plaintiff for erection of mill, manufacture of lumber, &c., per exhibit " S," in master's report, being a statement rendered to plaintiff by defendants, | $13,826.43 |
| Paid by plaintiff on account of mill property | 7,913.49 |
| Due from plaintiff on this account | 5,912.94 |
| Paid by defendants on account of real estate | 8,788.63 |
| "     by plaintiff as above | 7,913.49 |
| Whole costs of lands, mills, &c. | 16,702.12 |
| Due by defendants to plaintiff for manufacturing and delivering lumber prior to replevin | 2,651.54 |
| do.    do.    do.    lumber the subject of the replevin | 4,680.00 |
| | 7,331.54 |
| Due by plaintiff as above | 5,912.94 |
| | 1,418.60 |
| Five years' interest | 425.55 |
| Amount due plaintiff | 1,844.15 |
| Due by defendants to joint estate for the boards delivered by plaintiff, less cost of manufacturing, delivery, &c., | 4,624.46 |
| Allowed in replevin ($15,795) less do. | 11,115.00 |
| Boards from Butler,       less do. | 1,050.00 |
| | 16,799.46 |
| Whole costs of land | 16,702.13 |

17 P. F. SMITH—11

| | |
|---|---|
| Due by defendants to joint estate . . . . | $97.33 |
| Interest, five years, . . . . . . | 29.19 |
| Lumber from N. Taylor and 3½ years' interest . | 6,655.00 |
| Lumber delivered and deliverable under contract of sale with N. Taylor, with interest from the dates stipulated for delivering . . . . . | 25,429.50 |
| | 32,211.02 |
| Plaintiff's one-third . . . . . . | 10,737.00 |
| Due plaintiff from defendant as above . . . | 1,844.15 |

Due to plaintiff from defendants April 9th 1870 . $12,581.15

On the question of the account, the defendants claimed that they should be allowed two sums, amounting together to $2800 and endorsed by receipt marked " F. & G." They alleged that these sums had been paid since rendering the account in exhibit " S." For reasons given in his report, the master found that they were included in exhibit " S." and disallowed them.

There was evidence before the master of a contract between the parties and Thomas Hill for a sale of lumber, in which there was a failure to deliver: upon a compromise as to damages for breach of a contract, Lewis (defendant) paid Hill $250 for which the master did not allow him credit in the account :—There was evidence also that the defendants had paid Hill & Jackson $1200 for manufacturing lumber and $2000 counsel fees in the replevin suit, which sums were not allowed by the master.

He recommended that a decree be made in favor of the plaintiff against the defendants for $12,581.15.

The defendants filed the following exceptions with the master, which were overruled :—

1. Reporting that the action of replevin did not bar and estop the plaintiff from recovering in this case.

2. Reporting that on general equitable principles the plaintiff was not barred and estopped from recovering in this case.

3. Reporting that the plaintiff's bill could be sustained.

4. Reporting a decree of $12,581.15 in favor of the plaintiff and against the defendants.

5. Reporting in favor of W. W. Corbett and against Lewis & Nelson the sum $4680 for the manufacturing and running 585,000 feet of boards, for which the replevin was instituted. If any charge can be made for the boards replevied, it will have to be less 200,000 feet, which Corbett claimed as his own property in the said action of replevin.

6. Reporting Lewis & Nelson debtor to the mill $11,115, the amount allowed by the jury in the said replevin case for the 585,000 feet of boards in controversy in that case, less the

[Lewis & Nelson's Appeal.]

amount of costs of manufacturing. If they are debtor to any amount of the said sum, it must be less the value of the 200,000 feet claimed by Corbett in said action as his individual property.

7. Reporting Lewis & Nelson debtor, to $7200, being the value of the 400,000 feet of boards to be delivered by Newton Taylor in the spring of 1869, under his contract with Lewis & Nelson; while the evidence of Newton Taylor is that he delivered only 200,000 feet of the payment of 1869, and that the balance of said payment was to be in money, and that he had not paid the money.

8. Reporting Lewis & Nelson debtor to $5400, being the value of the 300,000 feet of boards to be delivered by Newton Taylor, under his contract in the spring of 1870. There is no evidence that any part or portion of said boards have been delivered.

9. Reporting in favor of a credit to Corbett of $900, being for logs, hauling the same, &c., the logs being the same that Corbett claimed the 200,000 feet of boards were made out of, that were in controversy in the said replevin suit.

10. Not reporting credits to Lewis & Nelson of $250, being the amount of damages paid Thomas Hill for the non-delivery to him of lumber; $1200, the amount paid to Jackson & Hill; $2000, the amount paid attorneys for trying replevin case. In not allowing credit of the two receipts, as per exhibits "F" and G."

11. Not reporting that the bill should be dismissed at costs of the plaintiff.

They also moved to dismiss the bill, the Act of Assembly removing the case being unconstitutional, and the Court of Common Pleas of Jefferson county having therefore no jurisdiction.

The court (Campbell, P. J.), September 16th 1870, overruled the motion to dismiss the bill, confirmed the report of the master, and decreed that the defendants forthwith pay to the plaintiff $12,581.18 with interest from April 9th 1870, and costs.

The defendants appealed to the Supreme Court, and assigned for error,—

1. Refusing the defendants' motion to dismiss the bill for want of jurisdiction, and because the Act of 10th of April 1867, changing the venue to Jefferson county, was repugnant to the constitution, and therefore null and void.

2. In entering a final decree for the plaintiff.

3. In overruling the following exceptions to the master's report, to wit (stating the exceptions in detail).

*J. Barton* (with whom were *Gordon & Brothers*), for appellants.—The establishment of a Court of Common Pleas for each county is that citizens may not be called to answer in distant parts of the state, and the removal in this case is as if the legislature had given the court of Jefferson county authority to call the defendants to answer there.

As to the estoppel by the judgment in replevin : Bickford *v.* Cooper, 5 Wright 142 ; Cist *v.* Zeigler, 16 S. & R. 282 ; Simpson *v.* Hart, 1 Johns. C. R. 39 ; White *v.* Reynolds, 3 Penna. R. 96 : Bower *v.* Tallman, 5 W. & S. 556 ; Marsh *v.* Pier, 4 Rawle 284.

The plaintiff did not comply with his covenants, and therefore the bill must fail : Brightly's Eq. 192 ; Miller *v.* Henlan, 1 P. F. Smith 268 ; Greenlee *v.* Greenlee, 10 Harris 235 ; Rittenhouse *v.* Levering, 6 W. & S. 190.

*G. A. Jenks* and *W. L. Corbett,* for appellee.—As to the change of venue they cited Commonwealth *v.* Hartman, 5 Harris 119 ; Commonwealth *v.* Maxwell, 3 Casey 444 ; Philadelphia *v.* Field, 8 P. F. Smith 320 ; Sharpless *v.* Philadelphia, 9 Harris 147 ; Commonwealth *v.* Martin, 2 Barr 244 ; Duff's Appeal, 6 P. F. Smith 436 ; Commonwealth *v.* Green, 8 Id. 226. As to the estoppel they cited Jackson *v.* Wood, 3 Wend. 35 ; Wood *v.* Jackson, 8 Id. 42 ; Lawrence *v.* Hunt, 10 Id. 85 ; Hibshman *v.* Dulleban, 4 Watts 190 ; Lentz *v.* Wallace, 5 Harris 412 ; Carmony *v* Hoober, 5 Barr 305 ; Tams *v.* Lewis, 6 Wright 402 ; Converse *v.* Colton, 13 Id. 351 ; 1 Starkie on Ev. 264, 265 ; Campbell *v.* Consalus, 25 N. Y. R. (11 Smith) 613 ; Campbell *v.* Butts, 3 N. Y. R. (3 Comstock) 173 ; Manny *v.* Harris, 2 Johns. 24 ; Young *v.* Runnell, 2 Hill 481 ; Benedick *v.* Post, 12 Barb. 168 ; Doty *v.* Brown, 4 N. Y. R. (4 Comstock) 71 ; Standish *v.* Parker, 2 Pick. 20.

Time was not of the essence of the contract here, and there was no gross negligence by the plaintiff, nor any change affecting the rights of the parties ; the plaintiff may therefore have specific execution : Brightly's Eq. J. 189 ; Tiernan *v.* Roland, 3 Harris 429.

The opinion of the court was delivered, January 16th 1871, by SHARSWOOD, J.—The first point made is on the constitutionality of the Act of Assembly of April 10th 1867, Pamph. L. 1067, entitled " An Act to change the venue in certain cases from Allegheny to Jefferson county." The bill in this case was filed originally in the District Court of Allegheny county, and was there pending when by this act it was directed to be removed to the Court of Common Pleas of Jefferson county. If there was a provision in the constitution that no man should be sued except in the county of his residence, there might be some reason for holding this and all other acts of the same kind unconstitutional. But there certainly is no such provision. It is supposed that the establishment of a Court of Common Pleas for each county by Art. V., sect. 1, necessarily implies as much. That would be carrying the doctrine of implication to a very extravagant length.

A prohibition may be implied even in a constitution, but the implication must be very plain and necessary. The legislature possess all legislative power except such as is prohibited by express words or necessary implication. No doubt the object of the institution of a Court of Common Pleas in each county was that the administration of justice might be brought as near as possible to every man's hearthstone. Of necessity, however, this cannot and ought not to be in all cases. The contention of the appellants would preclude the legislature from ever changing the venue of an action, though the voice of justice might imperatively demand it, and would even prevent the court of one county from entertaining jurisdiction where its process has been duly served on the citizen of another. Business or necessity might oblige him to be there for a time, and it may be said to be very unjust to subject him thereby to a lawsuit at a distance from his home. The argument proves entirely too much. It is a power which has been frequently exercised by the legislature thus far, at least, without question of its constitutionality.

The second question is as to the effect of the judgment in the replevin suit recovered by the defendants against the plaintiff in the District Court of Allegheny county, and which was afterwards on a writ of error affirmed in this court: Corbett *v.* Lewis, 3 P. F. Smith 322. It is strenuously contended that the judgment in that case settled conclusively that Corbett had not fulfilled his contract by the delivery of lumber to an amount sufficient to vest in him any title to one-third of the land, and that it wrought an estoppel upon him from setting up such a claim in any other action or proceeding. But it is too well settled to need either argument or authority to maintain it that the estoppel of a judgment extends only to the question directly involved in the issue, and not to any incidental or collateral matter, though it may have arisen and been passed upon. This is clearly stated in the language of Lord Chief Justice De Grey in The Duchess of Kingston's Case, 11 Harg. State Trials 261, 20 Howell's State Trials 538, 2 Smith's Lead. Cas. 424: "Neither the judgment of a court of concurrent or exclusive jurisdiction is evidence of any matter which came collaterally in question, though within their jurisdiction, nor of any matter incidentally cognisable, nor of any matter to be inferred by argument from the judgment." This rule, though there may sometimes be difficulty in applying it, has never since been called in question: Moulton *v.* Libbe, 15 N. H. 480; Hibshman *v.* Dulleban, 4 Watts 183; Lentz *v.* Wallace, 5 Harris 412; Martin *v.* Gernandt, 7 Id. 124. The direct issue in the replevin suit was the right of the plaintiff at the time the writ issued to the possession of the lumber described in it. That certainly involved the question whether at that time Corbett had furnished lumber under his agreement sufficient to pay the

cost of saw-mills and manufactory, when he was to receive an undivided third in the lands, mills, &c.   It was required that the jury should go into the accounts so far, and so far only, as was necessary to settle that question.   The direct object of that suit was not an account, and the judgment therefore could have been conclusive neither for or against either party in a subsequent proceeding for an account.   The case of Campbell *v.* Conzalus, 25 N. Y. 613, is entirely in point, and well illustrates the doctrine.   There had been a proceeding by a mortgagor to compel satisfaction, and upon the report of referees that there was still a balance due on it his bill was dismissed.   Upon a subsequent bill by the mortgagee to foreclose, it was contended that the decree in the first case estopped the defendant from setting up that the mortgage was then paid, but the court held the contrary unanimously. " In consequence," they say, " of the nature of the transaction, it was necessary to take and state an account between them which would show how much was due upon the mortgage, in order to determine whether anything was due ; but the evidence and inquiry as to the amount due was merely incidental or collateral to the direct issue whether anything was due."   Give to the judgment in the replevin suit the full force which only can be claimed for it as proving that on the 8th of April 1865, when the writ of replevin was issued, the cost of the saw-mills and manufactory had not been paid for by Corbett, there is no finding or decree here which contradicts that fact.   Schedule 6, reported by the master, shows that after crediting the mill with the full amount allowed by the jury in that case (less the cost of manufacturing and running), $11,115, Lewis & Nelson were only found indebted to the mill, after deducting its full cost, $97.33. Had the lumber been delivered under the writ to the plaintiffs therein instead of having been retained by Corbett on a claim-property bond, it cannot be doubted that it would have been a delivery under the contract to be charged against the cost of .the mill, nor ought it to be any less doubtful that the damages recovered took the place of the lumber, to the extent of its value, and when paid by Corbett were a credit upon his contract.

Nor do we perceive any evidence of such fraud or violation of contract on the part of the plaintiff as ought to preclude him from the relief which he seeks by his bill in a court of equity.   That he did wrong in withholding the lumber, which was the subject of the replevin, the jury in that suit decided, and he paid for it in costs and damages not allowed in this account.   It is not every unfounded claim which a man may make or unfounded defence which he may set up, which will bar him from proceeding in a court of equity.   The rule that he who comes into equity must come with clean hands must be understood to refer to wilful misconduct in regard to the matter in litigation :  Snell's Principles 35.   All the

illustrations given in Francis, p. 5, under the maxim, as he states it, "He that hath committed iniquity shall not have equity," show this. There is nothing in the evidence to evince that Corbett did not believe that the lumber which he had ready to deliver at the time the replevin was issued would more than balance the account, and that he had a right to a settlement before delivery. The master has reported that down to the sale to Hill & Jackson it is not even alleged that Corbett did not perform his part of the contract. That sale certainly was a waiver by Lewis & Nelson of any further performance by him, for it put it out of his power by delivery of possession to the purchasers.

We come now to the 3d error assigned, which is that the court below erred in overruling the exceptions to the master's report. These exceptions are not numbered, but the first five and the 11th have been already considered. The 6th and 9th take exception to the credit to Corbett for the 200,000 feet claimed by him in the replevin as his own separate property and of the nine hundred dollars for hauling the same. As to these matters, however, the verdict and judgment in that suit must be regarded as conclusive on both parties. It found Lewis & Nelson to be entitled to the possession of the whole, and that under their agreement with Corbett. It mattered not, therefore, upon what ground this decision was arrived at—whether that the two hundred thousand feet were bought with funds advanced by Lewis & Nelson, or were improperly mixed by Corbet with the other lumber to the possession of which for sale they were entitled. The mixture could only have the effect of confounding these boards with those deliverable under the contract, and making them a part thereof. It could not create a new original and independent title to them. They must necessarily partake of the character of the title of Lewis & Nelson to those with which they were confused. Thus a mortgagee suing for the possession of the hypothecated property with which other property of the mortgagor had been so intermixed as not to be distinguishable, must take and hold the whole subject to redemption and account. So here Lewis & Nelson receiving the order of the whole on the title arising from Corbett's agreement, must be held to have received the whole subject to account.

The 7th and 8th exceptions we think should have been sustained. The master charged Lewis & Nelson with the whole amount of the value of the lumber for which they contracted to sell the property to Newton Taylor, although it was an unquestionable fact in the cause that a large amount of it had not been received by them at the time to which the account was made up. By claiming what may for brevity's sake be called the price or purchase-money of the fee simple contracted to be sold to Taylor, Corbett necessarily affirms that sale. The master says: "Viewing the contract of sale as a conversion by Lewis & Nelson of the

[Lewis & Nelson's Appeal.]

real and personal estate, equity would charge them with the actual money value of the personalty thus substituted for the realty, at the time receivable under the provisions of the contract." But it is not easy to perceive on what principle a tenant in common having made a contract to sell the common property with the consent, or, what amounts to the same thing, the subsequent ratification or affirmance of the other tenant, is in equity liable to account for more than he has actually received, when there is no fraud or bad faith, neither of which is imputed here. Had they actually parted with the legal title to a purchaser without notice so that Corbett was thereby divested entirely of his claim to the land, there would perhaps be some plausible reason for holding them to account for the full value at the time of the sale, and assuming the agreed consideration in the deed, whether paid or not, as evidence of that value. But by the terms of the agreement with Taylor, dated December 26th 1865, no conveyance of the legal title is to be made to him until all the requirements of the article are complied with. Lewis & Nelson still hold the legal title as security for the balance of the purchase-money yet unpaid. That balance never may be paid. They may be compelled to proceed upon their legal title to collect it. The vendee may not be able to comply with the terms of a conditional verdict, and the land may have to be resumed or sold by the sheriff. At all events they may be subjected to costs, expenses and delay before the amount shall be fully realized. By the decree made on the master's report, Lewis & Nelson are in effect compelled to become purchasers of Corbett's interest. The plaintiff does not appear to have insisted upon a conveyance to him from Lewis & Nelson of the legal title to one-third, subject of course to Taylor's equity. He is willing to accept his personal recourse against them for the purchase-money of the property contracted to be sold: but he cannot in equity, as it appears to us, call upon them to pay over to him any portion of that purchase-money, before it has been actually received. As the record must be remitted, and the account sent back to the master to be re-adjusted according to this opinion, it may be proper to observe that if any of the purchase-money has been received since this account was made up, it should be charged so as to bring up the settlement to the date of the final account.

As to the 10th exception, which includes several items, we may say that we think that the master ought to have allowed Lewis & Nelson a credit for the $250 paid to Thomas Hill for damages for the non-delivery of the lumber contracted to be sold to him, as well as for the $1200 paid by them to Hill & Jackson for money which they spent on the property in making boards; but we see no reason for allowing them for the fees paid to their counsel for the trial of the replevin suit. In an account as

[Lewis & Nelson's Appeal.]

between tenants in common, which this is, all disbursements by either for the recovery, defence or protection of the joint property are legitimate matters of discharge, but not the law expenses of any adverse suits between the tenants in common themselves.   Such cases must follow the ordinary rule which punishes the losing party with the legal costs.   Had Corbett succeeded in that suit he could not have charged Lewis & Nelson with the fees paid to his counsel.   He might with as good reason claim to charge them with the fees paid by him in this case.   The right must be a mutual one if it exists at all.   As to the two receipts of October 14th 1863 and November 4th 1863, said to be marked F and G, we have not been furnished with copies, and see no reason to dissent from the conclusion which the master reached in regard to them.

We have thus considered and disposed of all the exceptions to the master's report, under the 3d. assignment, from a desire to decide all the questions of importance in the cause.   But we have not overlooked the fact that this assignment is in violation of Rule VI. (6 Harris 578), that "if any specification embrace more than one point, or raise more than one distinct question, it shall be considered a waiver of all the errors so alleged."

Decree reversed, and record remitted for further proceedings.

WILLIAMS, J.—I concur in this opinion—but I would go further, and allow a deduction of the counsel fees paid by Lewis & Nelson in the replevin case.