## Bradich, Adrx., *v.* Metropolitan Life Insurance Company, Appellant.

Argued April 22, 1937.

Before KELLER, P. J., CUNNINGHAM, BALD-RIGE, STADTFELD, PARKER, JAMES and RHODES, JJ.

*Lawrence M. Sebring,* for appellant.

*Clyde Holt,* with him *Harry B. Richardson,* of *Holt, Holt & Richardson,* for appellee.

OPINION BY CUNNINGHAM, J., October 6, 1937:

On November 1, 1932, the defendant insurance company issued its contract promising to pay to the Estate of Mike Pavich $1,000, upon receipt of due proof of his death. The policy was "issued in consideration of the application therefor" and of the payment of a monthly premium of $2.80. Attached to the policy was the application in two parts, designated A and B—Part A having been signed by the insured on October 12, 1932, in the presence of N. P. Landay, one of the company's agents, and Part B two days later in the presence of Dr. J. L. Miller, one of the company's medical examiners, and "the usual medical attendant" of the insured. We are concerned in this case with Part B of the application.

The insured died of pulmonary tuberculosis on March 9, 1933. Proofs of death were duly filed in behalf of the insured's estate the latter part of that month.

Payment having been refused, suit was brought on September 27, 1933, to recover the face of the policy. In the affidavit of defense the death of the insured, the appointment of plaintiff as administratrix of his estate,

and the issuing of the policy were admitted, but the company asserted it had been obtained by false and fraudulent representations upon the part of the insured. Payment of premiums in the total amount of $11.20 was admitted, the return thereof tendered, and the money paid into court.

As new matter, the company pleaded the following paragraphs from the application:

Part A: "It is understood and agreed ...... That the foregoing statements and answers are correct and wholly true, and, together with the answers to questions on Part B hereof, they shall form the basis of the contract of insurance, if one be issued."

Part B: "I hereby certify that I have read the answers to the questions in Part A hereof and to the questions in Part B hereof, before signing, and that they have been correctly written, as given by me, and that they are full, true and complete, and that there are no exceptions to any of such answers other than as stated herein."

Four questions and answers from Part B of the application, Nos. 6, 7, 17 and 18, were involved in the litigation. These questions, answers, and the issues framed under each by the pleadings, were:

"6. Present condition of health? Answer: Good." The company averred the insured was not in good health but was at the time "suffering from pulmonary tuberculosis and laryngeal tuberculosis." Plaintiff's reply was that the insured was not suffering from those diseases when he made the application, or at least had no knowledge that he was afflicted with either.

"7. (a) When last sick? Answer: May, 1932. (b) Nature of sickness? Answer: Grippe. (c) How long sick? Answer: 3-4 days." The company alleged the insured's illness was not grippe, but tuberculosis.

"17. Have you ever had any of the following complaints or diseases ...... consumption? If yes, give

particulars, dates and duration. Answer: None."
With relation to this question and answer, the company
averred insured had been suffering from the stated
diseases at least since July 18, 1932.

The reply of the plaintiff was that these answers
were believed by the insured to be correct, and that if
he had either or both diseases at the date of his applica-
tion such fact was "unknown" to him.

"18. Have you been attended by a physician during
the last five years? If yes, give name of complaints,
dates, how long sick and names of physicians. An-
swer: Dr. Miller, May, 1932, Grippe 4 days."

The company charged that the insured had also been
attended and treated by Dr. L. H. Landay from July
18 to August 22, 1932, for tuberculosis; that the an-
swers above quoted were false and fraudulent, were
known to insured to be false, and were made for the
purpose of deceiving, and did deceive, the insurer.

Plaintiff's reply was, in effect, that the insured did
not knowingly make any false answers, and that the
company was not deceived as its own physician ex-
amined insured on October 12, 1932, and recommended
him for insurance.

Two trials were had upon the issues thus framed
by the pleadings; each resulted in a verdict for the
plaintiff for the face of the policy, the last, rendered
January 21, 1936, being for $1,170. The company's
motions for judgment in its favor n. o. v. or a new trial
were denied and it now appeals from the judgment en-
tered upon the verdict.

Assignments one and thirteen are based upon the
refusal of the trial judge to affirm appellant's point for
binding instructions and the subsequent denial of its
motion for judgment in its favor upon the whole record.
The other assignments relate to alleged trial errors in
admitting certain evidence and in answering points for

charge which, it is contended, entitle appellant at least to a new trial.

The underlying question here involved is whether the learned trial judge, READER, P. J., erred in refusing appellant's point for binding instructions and denying its subsequent motion for judgment n. o. v.

In reply to appellee's prima facie case, appellant undertook to support its affirmative defense by the evidence of two physicians, one lay witness, and the offering in evidence of the proofs of death. Its main attack upon the representation by the insured that his only previous medical attendance had been by Dr. Miller during an attack of grippe in May, 1932, which lasted four days, was the testimony of Dr. L. H. Landay, a practicing physician in Aliquippa, who testified that the insured came to his office on July 18, 1932, complaining of "an infection in the right middle ear," for which he treated him from that date until August 22d of that year, and during which period the insured visited the office of the witness nine times. After the witness had testified there was a discharge of pus from the ear during the entire course of treatment, counsel for appellant endeavored to have him say that the insured was also then afflicted with tuberculosis. This effort was not successful. The substance of his testimony was thus accurately stated by the trial judge in sustaining an objection to a question: "He has said that he did not make a special examination of the lungs of this man at the time he treated him from July 18 to August 22, 1932, but that the general condition of the man led him to suspect that he had tuberculosis, and that an examination to determine that would be justified, but he did not have opportunity to investigate it."

One of the papers (Defendant's Exhibit A-3) included in the proofs of death was a certificate given by the witness. In it the witness stated he had treated the insured for pulmonary tuberculosis from July 18 to

August 22, 1932, and that the "immediate cause of death" was "pulmonary tuberculosis" from which the insured had been suffering for an "indefinite" length of time. It was also stated in the certificate that a contributory cause was laryngeal tuberculosis, the duration of which had been "about 8 mos." When the attention of the doctor was directed to these statements, his explanation of the apparent contradiction between his certificate and his testimony was that after the insured had ceased coming to his office for treatment he incidentally saw him in the Beaver County Tuberculosis Institute while the witness was making a visit to one of his own patients; that he there discussed insured's condition with Dr. Wilson, the physician in charge of the hospital, and that the statement in his certificate was based upon the information he thus subsequently acquired rather than upon his knowledge at the time the insured came to him on July 18th. The following question and answer indicate that notwithstanding the positive statements in the certificate the witness did not know during the course of his treatment of the insured in July and August that he had tuberculosis. "Q. After you had seen him and his appearance at the sanitorium, together with your knowledge gleaned in the course of the treatment during the period that you treated him, did you then have a medical opinion, after you had seen him in the sanatorium, as to what the man was suffering from at the time he had been under your treatment? A. He still was suffering from the middle ear infection. A man can have tuberculosis and have a middle ear infection. If he did have tuberculosis, I still did not treat him for it; I was treating him for ailment to his middle ear." It was stipulated at the trial that the insured was a patient in the tuberculosis hospital from November 26, 1932, (subsequent to the date of the policy) until two days before his death.

John Borich, with whom the insured boarded and from whose house he went to the hospital, testified the insured had told him about his visits to Dr. Landay and that the doctor had told him (the insured) that "he had a bad sickness." There was no evidence that this statement referred to anything more serious than the infected ear. This witness also testified that the insured who had lived at his house some eight or ten weeks was "coughing all the time."

Dr. H. L. Grazier, in charge of the hospital at the Jones and Laughlin plant where insured was employed, testified he had examined him, at the instance of the mill superintendent, on November 18, 1932, and found him then suffering from pulmonary tuberculosis. He expressed the opinion that the insured had been suffering from that disease for "six months to a year, roughly speaking or relatively speaking." When asked in cross-examination whether his opinion as to the length of time insured had tuberculosis was not conjectural the witness replied, "Oh, very much so." He also stated that it would have been quite possible for the insured to have been suffering from the disease "and yet be entirely ignorant of the fact." Appellant had the burden of showing upon this branch of the case, not only that the insured's health was not good but also that he had knowledge of that fact. There is no evidence upon the record that the insured had been informed by any doctor or from any source, prior to obtaining the policy, that he had tuberculosis in any form. The earliest definite time at which insured was shown to have had tuberculosis was the date of his examination by Dr. Grazier. The proofs of death also included a certificate from Dr. Grazier that he had attended insured from November 18, 1932, to the time of his death from tuberculosis. His statement in his certificate that the duration of the disease had been six months was qualified, as above indicated, by his testimony.

In rebuttal of this evidence, appellee was permitted, over appellant's objection, to introduce evidence with relation to insured's ability to speak and understand English. Several witnesses testified he spoke both Serbian and Croatian, and in speaking with him he insisted they speak one of his own languages rather than English. The admission of this evidence is the basis of the second assignment. There was countervailing evidence, particularly from Dr. Miller, who understood both Serbian and Croatian to a limited extent, that the insured answered the questions addressed to him during the medical examination in English and that his answers were written down exactly as given. Appellee also called witnesses who testified they observed nothing in insured's physical appearance indicative of failing health. It was shown by the pay rolls of his employer that he worked regularly up to November 17, 1932, the day before he was examined by Dr. Grazier.

The alleged false answers upon which appellant plants its defense divide themselves into two classes: (a) those relating to the condition of the insured's health at and previous to his application for the policy, and (b) those respecting previous medical attendance.

As to the first group, there was competent evidence from which a jury could find that the insured stated to Dr. J. L. Miller, appellant's medical examiner, on October 14, 1932, that the condition of his health at that time was good; that he was last sick with grippe for three or four days in May, 1932; and that he had never had consumption. Incidentally, it may be noted that the insured stated in the course of the examination that the examiner to whom he was talking was the physician who had treated him for grippe in May, 1932. Dr. Miller did not, in his testimony, deny he had treated the insured for that disease at that time, but stated he had no record in his books of such professional service.

In connection with the issues arising under the answers relative to the condition of the applicant's health there is another significant circumstance which should be taken into consideration.

It is in evidence that the policy issued as a result of the examination and report of appellant's medical examiner. Obviously, he failed to detect any symptoms of tuberculosis.

Subsequent to the disposition of this case in the court below, our Supreme Court filed an opinion in *Prudential Insurance Company of America v. Kudoba et al.,* 323 Pa. 30, 186 A. 793, in which the effect of the "passing" by a medical examiner for the company of an applicant for insurance upon the right of the company to defend an action on the policy upon the ground of the unsound health of the insured at the time of the application and the date of the policy was considered at length. The policy in that case contained a provision that it should not take effect if on the date thereof the insured was not in sound health. It does not appear from the record in this case that the policy now in suit contained such a provision, but there, as here, the medical examiner for the company had examined and passed the insured. In the course of the opinion it was said: "If [a medical] examination is made and the company, either with knowledge of an illness of the applicant thereby disclosed or without discovery of a pathological condition which in fact existed, thereupon issues a policy, it should not be allowed to repudiate liability by reason of any defective status of the health of the insured at that time, in the absence of any misrepresentations or fraudulent statements on his part."[1]

---

[1] It is of interest to note that this has been made a statutory rule by the Act of July 19, 1935, P. L. 1319, (40 PS §511a. Supplement) which adds a new provision to section 411 of our Insurance Law of May 17, 1921, P. L. 682. As the cause of action

As above indicated, this record is barren of any evidence from which a jury could reasonably find that this insured knowingly misrepresented facts when he stated to the medical examiner that his health was good and that he had never had consumption, or that any kind of fraud was practiced upon the company's physician in connection with this group of answers.

The case of *Evans v. Penn Mutual L. Ins. Co.*, 322 Pa. 547, 186 A. 133, in which the Supreme Court enunciated and summarized the principles of law applicable to the type of cases to which this one belongs, was also decided subsequent to the entering of the judgment below. In that case Mr. Justice DREW reaffirmed several previous cases and said (p. 554): "When the applicant states he is in good health and believes it to be so, though in fact he is suffering from some insidious disorder or latent disease of which he is not aware, a recovery may be had." We think nothing further need be said upon this branch of the case.

As to the second group of answers, relating as they do to previous medical attendance, we have a different situation. Appellant endeavored to support its contention as to the wilful falsity of these answers by the oral evidence of Dr. Miller and Dr. Landay. The testimony of Dr. L. H. Landay relative to numerous visits of the insured to his office between July 18 and August 22, 1932, for treatment of an infected ear was not contradicted in any way. If the testimony of these witnesses is accepted, it follows that when the insured stated in response to question No. 7 that his last sickness was grippe, lasting three or four days, and in response to question No. 18 that the physician consulted by him during the preceding five years was, "Dr. Miller, May, 1932, grippe, four days," he at least failed to make

in this case arose and the suit was brought prior to the effective date of the amendment, the statutory provision has no application to the case at bar.

a full disclosure of facts material to the risk and necessarily within his knowledge. It is not questioned in this case that these answers were representations and were material to the risk; the test of recovery, therefore, is the good faith of the insured in making them. As above indicated, appellant had the burden of showing not only that the answers were correctly written down by its representative and were false, but in addition thereto that they were not made inadvertently but with the intention of concealing the truth. It was also said in the Evans case (p. 552): "Whether true answers were made, and whether the answers as made were correctly written down by the agent of the insurance company, and the good faith of the party making the answers to the best of his knowledge and belief, are questions which go to the very essence of the insurance risk, and parties should not be denied the right to have such matters determined before a proper tribunal unless they have covenanted otherwise."

That case is also authority for the proposition (p. 553) that, "It is sufficient to show that they were false in fact and that insured knew they were false when he made them (see *Lilly v. Metropolitan Life Ins. Co.*, supra, page 251; *Stein v. New York Life Ins. Co.*, supra. page 227), since an answer known by insured to be false when made is presumptively fraudulent."

As to the "proper tribunal" for the disposition of the issues here involved, it is said in the Evans case (p. 555): "Ordinarily the question of the truth or falsity of the answers and whether or not they were given by insured in good faith is for the jury."

And again, (p. 560): "Whenever disputed questions of fact are presented by conflicting evidence, whether documentary or oral, or whenever the insurer's defense depends upon the testimony of its witnesses, even though such testimony is uncontradicted, the case must be submitted to the jury, subject to the trial court's

power to award a new trial as often as in its sound discretion it may think the interests of justice require."

Here, the testimony of Dr. Landay, with respect to his treatment of the insured for an infected ear, and the testimony of Dr. Miller, with relation to the recording of the answers, is uncontradicted, but they were both called by appellant. There is a conflict in the evidence with respect to the ability of the insured to understand English. We have already commented upon the extent to which Dr. Landay's written statements in the proofs of death have been explained away by his testimony.

Granting that the insured failed to disclose his attendance by Dr. Landay, it was still for the jury to say whether the concealment was fraudulent. In *Adams v. Metropolitan L. Ins. Co.*, 322 Pa. 564, 186 A. 144, the answers of an applicant to the same question (No. 18) were under consideration and a somewhat similar failure to disclose dates and names of physicians was involved.

It was there pointed out that the term "good health," when used in a policy of life insurance "means that the applicant has no grave, important or serious disease, and is free from any ailment that seriously affects the general soundness and healthfulness of the system." Our Supreme Court there said: "It is clear that, while such [answers] are material to the risk *(Murphy v. Prud. Ins. Co.*, 205 Pa. 444, 453; *Rigby v. Metro. Life Ins. Co.*, 240 Pa. 332, 336), the failure to report every attendance or treatment by a physician does not alone constitute fraud, as for instance where the application does not disclose attendance for headaches, grippe, acute colds, indigestion, or other comparatively minor illnesses: *Livingood v. N. Y. Life Ins. Co.*, 287 Pa. 128, 132; *McBride v. Sun Life Ins. Co.*, 90 Pa. Superior Ct. 35; cf. *Baer v. State Life Ins. Co.*, 256 Pa. 177, 183; *Kuhns v. N. Y. Life Ins. Co.*, 297 Pa. 418, 424-5. In each

of those cases a jury's verdict in favor of the beneficiary was upheld, despite the nondisclosure."

Again, the following statement from *Livingood v. N. Y. Life Ins. Co.*, 287 Pa. 128, 134 A. 474, was quoted with approval in the Evans case, (p. 553): " 'Where the misstatement has been set forth inadvertently, or the narrative is incomplete in detail, and was made without intention of concealing the truth, a recovery is permissible, the question of good faith being for the jury.' "

It was, therefore, for the jury to determine whether the failure of the insured to disclose that he had been treated for such an infection of one of his ears as was described by Dr. Landay was a fraudulent concealment of medical attendance for a "grave, important or serious illness."

See also *Osche v. New York Life Insurance Co.*, 324 Pa. 1, 187 A. 396.

The case at bar differs materially from our recent case of *Loder v. Metropolitan Life Insurance Co.*, 128 Pa. Superior Ct. 155, 193 A. 403, in that in the latter there was unimpeached documentary evidence of the falsity of the answers of the insured, and also from *Boltz v. Metropolitan Life Insurance Co.*, 128 Pa. Superior Ct. 147, 193 A. 400, where the falsity was established by the testimony of the plaintiff, the beneficiary in the policy.

Our conclusion upon the main proposition in this case is that the application of the established principles of law to the evidence upon the record results in the conclusion that the jury was the proper tribunal for the decision of the issues raised by the parties.

It is necessary to refer briefly to the grounds assigned by appellant for at least a new trial. Its counsel cites and relies upon *Panopoulos v. Metropolitan Life Insurance Co.*, 96 Pa. Superior Ct. 415, in support of his contention that it was reversible error for the trial judge to admit testimony relative to the insured's

limited ability to understand and express himself in English. That case did not deal with the admissibility of such evidence, but rather with the effect to be given to it. The case cited was one in which it had been shown by unimpeached documentary evidence—hospital records of medical and surgical attendance and treatment of the insured for most serious diseases—that she had deliberately made false representations concerning matters of which she necessarily had personal knowledge, in order to obtain the policy sued upon. The beneficiary did not undertake to answer this defense by evidence that the answers were believed by the applicant to be true or had been erroneously recorded. He merely attempted to contradict the defendant's documentary evidence by testimony that the insured was somewhat illiterate, could not read English and understood and spoke it poorly.

We there held that "proof of the inability of the deceased to read or understand the English language did not in itself raise an issue upon the question whether the answers were made in good faith."

In other words that such evidence was not sufficient, in and of itself, to take a case to the jury where the insurer, under all the other evidence, would be entitled to binding instructions.

Here, the situation was quite different. This appellant's defense rested upon the oral testimony of its witnesses. The extent of the insured's knowledge and use of English was in dispute under the evidence relating thereto. There was no evidence concerning his ability to read English. As we have already held, the issue in this case as to the insured's good faith was for the jury. The reason assigned by the trial judge for overruling appellant's motion to strike out this testimony reads: "It appears now that the deceased, Mike Pavich, probably did not do more than write his name in English, and he had some difficulty in understand-

ing English when spoken; and that the answers to the application and medical examination were made out, or filled in, in the application and medical examination by men who were then acting as the soliciting agent and as the medical examiner for the company. Now, I think that situation would justify us in submitting the question to the jury."

After reviewing, in his charge, the conflicting evidence upon the subject, the trial judge said: "Now the mere fact that he had difficulty in understanding and speaking English does not establish that he did not understand these questions and answers." We think the trial judge has fully vindicated his disposition of the matter in the following excerpt from his opinion supporting his rulings upon appellant's motions. "The fact of his understanding or not understanding English, as the jury might find from the evidence, was merely called to their attention as one of the circumstances to be weighed in determining whether Pavich understood the questions and answers as found in the application, and this has bearing upon the question of his good faith in making the answers."

Having examined all the assignments and considered at length those covered by appellant's statement of questions involved, we are all of opinion that none of them can be sustained.

Judgment affirmed.