Engle *v.* National Council, Junior Order United American Mechanics of U. S. of North America, Appellant.

Argued April 27, 1938.

Before KELLER, P. J., CUNNINGHAM, BALDRIGE, STADTFELD, PARKER and RHODES, JJ.

*G. Kirby Herrington,* of *Mulvihill, Gollmar & Herrington,* with him *Alex. L. McNaugher* and *Kooser & Courtney,* for appellant.

*Archibald M. Matthews,* for appellee.

OPINION BY CUNNINGHAM, J., October 10, 1938:

George D. Engle, husband of the plaintiff below and

appellee herein, made application for membership in what is known as the "Beneficiary Degree" of the appellant fraternal order, and was issued a certificate and contract of life insurance on March 30, 1935. He was then forty-eight years of age. By the terms of the contract the insurer agreed to pay him $1,000 upon his seventieth birthday, or upon proof of his death prior thereto to pay that amount to his wife, Barbara. He died suddenly May 5, 1935, from a heart condition. Payment of the claim was refused, whereupon appellee brought suit as the beneficiary under the policy.

Appellant set up three defenses: First, that appellee had failed to pursue certain remedies within the order before bringing suit; second, that the insured had warranted he was free from any heart disease, whereas in point of fact he was suffering from endocarditis at the time the policy was issued; and third, that the insured had falsely answered a question concerning the last time he had consulted a physician. The learned trial judge, being of opinion that there was no issue of fact on any of these points upon which appellant was entitled to go to the jury, directed a verdict in favor of the beneficiary for the face of the certificate, with interest. Appellant's motions for judgment n. o. v. or a new trial were subsequently denied, and this appeal from the judgment entered upon the verdict followed.

The general and fundamental question with which we are confronted in disposing of this appeal is whether there is any competent evidence upon this record which entitled the appellant insurer to go to the jury upon any of the issues framed by the pleadings. If there is such evidence it must be found in the portions of the testimony and exhibits to which counsel for appellant point as supporting their contention that the insured fraudulently procured the certificate of insurance by knowingly making false answers to questions asked him by the insurer's solicitor and medical examiner

with relation to the condition of his health when the certificate was applied for and concerning previous consultations with a physician.

We shall, therefore, defer for the present consideration of the contention that the beneficiary was required to show she had "exhausted her entire remedy within the order."

Turning to the question of alleged false answers, in reliance upon which it is contended the policy was issued, it is to be noted that the contract of insurance is not one in which the insurer waived a written application and a medical examination and elected to protect itself by the insertion therein of a "sound health" clause, to the effect that the contract should not take effect if the insured was not in sound health when it issued, but was issued upon a written application, signed by the insured on March 22, 1935, and containing the insured's answers to some forty questions propounded to him by the insurer's solicitor, and after a thorough medical examination on the following day by Dr. W. J. George, the insurer's medical examiner for the local council of which the insured was a beneficial member. We agree with the court below that the solicitor and medical examiner were the agents of appellant, regardless of any statement to the contrary inserted in the certificate.

The questions and answers thereto material to this branch of the case read:

"7. Are you in good health? Yes." ......

"11. Have you ever been afflicted with any of the following complaints or diseases? ...... Asthma, bronchitis, pneumonia, pleurisy, consumption, spitting of blood, shortness of breath, or any disease of the throat, heart or lungs? No."

In connection with his application the insured declared: "I am in sound mental and physical condition and that all the foregoing answers and statements,

whether written in my own hand or not, together with all answers and statements made or to be made to the Medical Examiner in pursuance thereof and all statements and representations of fact made by me in or in connection with this application are hereby warranted to be full, complete and true."

The evidence upon which appellant relies as proof of the falsity in fact of the above answers is uncontradicted. Dr. B. L. Savitz, the insured's attending physician for a year, testified and certified in the proofs of death that the cause of insured's death was "chronic endocarditis," or "long standing leaking heart." Material questions and answers appearing in the certificate of Dr. Savitz constituting part of the proofs of death read:

"7. For what did you treat or advise deceased prior to his last illness? Give date, duration and result of each. Nov. 1934, Cardiac condition.

"8. Did you attend deceased during his last sickness? Sudden attack.

"12. What disease was the immediate cause of death? Embolus—Chronic endocarditis. Was there any contributing or remote cause of death? No. ......

"13. How long did deceased suffer from this disease? Apx. 10 years."

The above statement by Dr. Savitz that he had treated and "advised" the insured in November, 1934, for a "cardiac condition" was nullified by his testimony when called by the appellant as one of its witnesses at the trial. We quote from his direct examination: "Q. Did Mr. Engle ever consult you at any time between 1923 and March 22, 1935? A. He did. Q. When during that period of time did he consult you? A. Once on November 9, 1934. Q. What did he consult you for at that time, doctor? A. For influenza; an acute cold or influenza at that time. Q. Did you make an examination of Mr. Engle at that time? A. Yes, sir. Q. What

was your diagnosis of his condition? A. Acute sore throat and influenza, and chronic endocarditis. Q. Did you prescribe treatment for him? A. Yes, sir. Q. Did you give him any medicine at that time? A. I did at that time."

It is significant that the witness did not testify he "advised" the insured he had a diseased heart or that he treated him for that condition. It was definitely developed by his cross-examination that he did not tell the insured of, or treat him for, his heart condition. The cross-examination reads: "Q. Doctor, what did Mr. Engle come to you to be treated for? A. For an acute cold. Q. And what did you treat him for? A. For an acute cold. Q. You did not treat him for chronic endocarditis, did you? A. I did not treat him for that condition at that time. ...... Q. Did you advise this patient at that time that he had this heart condition? A. Not at that time." The meaning of the qualification, "at that time," was neither explained by the witness nor developed by counsel, nor was there any evidence that the doctor saw the insured professionally at any other time, or ever told him he had a diseased heart.

Appellee when called as for cross-examination testified: "A. All I know he was to the doctor in 1935; we all had the grippe and cold and I sent him to the doctor to get something for us; that is all I know. Q. When was that, Mrs. Engle? A. In 1935. Q. What time in 1935? A. Well, I don't remember any more what month it was. Q. How long before he died? A. Well, I can't remember the time we had it; I know we did have the grippe; I told you in 1935, I sent him to the doctor to get something for us, and I gave him some grippe tablets. Q. What doctor did you send him to? A. Dr. Savitz. Q. Do you know whether he did go to Dr. Savitz? A. Yes, sir, he had medicine for the grippe and cold, and I gave him some of the grippe tablets.

Q. Dr. Savitz gave him medicine then? A. Yes, sir, for the family and I gave him some of them. Q. Were you with him? A. No, sir, I wasn't. Q. Was your husband ill at that time? A. No, sir; he had the grippe and cold the same as we had but he was up and around; he was at the barn every day. Q. About what time of the year was that, Mrs. Engle? A. I don't remember. Q. Wasn't that in October or November of the year 1934? A. No, sir, it wasn't. Q. Well, when was it then? A. Well, I believe it was in 1935 when we had the grippe and cold."

Granting that appellant adduced uncontradicted testimony from which a jury could find that the insured's statements that at the time of the application for the insurance he was in good health and had never been afflicted with any disease of the heart were not true, such proof would not be sufficient to defeat appellee's right to recover upon the contract.

Appellant was estopped by the report of its medical examiner from setting up this defense. It is clear under the testimony we have quoted that the disease with which the insured was afflicted was an insidious one and that he had never been told, or had any reason to believe, that he was so afflicted. See *Adams v. Metropolitan Life Insurance Co.*, 120 Pa. Superior Ct. 309, 182 A. 112, affirmed by the Supreme Court in 322 Pa. 564, 186 A. 144. This precludes any suggestion that the insured's statement relative to the condition of his health was fraudulently made.

Although this contract was issued and the death of the insured occurred prior to the effective date of the Act of July 19, 1935, P. L. 1319, 40 PS §511(a), the decision of the Supreme Court in *Prudential Insurance Co. v. Kudoba et al.*, 323 Pa. 30, 186 A. 793, prevents appellant from successfully defending upon the ground now under consideration. There, as here, the medical examiner of the insurer had passed the applicant as a

fit subject for insurance, although he was at the time suffering from tuberculosis. In the case at bar the insured had obtained a clean bill of health from the examining physician for the appellant. In a carefully worded questionnaire, which called for an exhaustive physical examination, the medical examiner stated that the appearance of the insured indicated good health; that he had no diseases or disorders which affected his health at that time; and that he advised the issuance of a policy and considered the insured a first-class risk. Upon the questions specifically directed toward the examination of the heart, the following appears: "A. Is the heart's action uniform, free and steady? Yes. B. Are the valvular sounds healthy? Yes. C. Are the heart and blood vessels free from any indication of disease? Yes. D. What is the character of the pulse as to fullness, compressibility, etc.? Full and strong. E. Is it regular? Yes."

Finally, the examiner stated he had discovered nothing which affected the character of the risk which was not set forth in the answers.

In the Kudoba case it was held that as the insured had been passed as a satisfactory risk by the insurer's medical examiner the insurance company was estopped, in the absence of fraud, from making the defense that the insured was not in sound health at the date of the medical examination.

At page 35 Mr. Justice STERN said: "If an examination is made and the company, either with knowledge of an illness of the applicant thereby disclosed or without discovery of a pathological condition which in fact, existed, thereupon issues a policy, it should not be allowed to repudiate liability by reason of any defective status of the health of the insured at that time, in the absence of any misrepresentations or fraudulent statements on his part." See also *Bradich, Adrx. v.*

*Metropolitan Life Insurance Co.,* 128 Pa. Superior Ct. 513, 194 A. 522.

It is argued, however, by counsel for appellant, that as the answers in the application were specifically styled warranties the falsity in fact of any answer rendered the contract void and that it is immaterial whether the insured knew the answers to be false: *Evans v. Penn Mutual L. Ins. Co.,* 322 Pa. 547, 186 A. 133. We are not convinced that the general rule referred to in the Evans case is applicable here, particularly since the decision in the Kudoba case. While the distinction between warranties and representations was not discussed in the Kudoba case the insurance contract there involved contained a "sound health clause" and the decision turned upon the effect and limitation upon the operation of that clause in cases in which the insured had been examined and passed by the insurer's medical examiner. It was pointed out by this court in the case of *Youngblood, Adm. v. Prudential Insurance Co. of America,* 109 Pa. Superior Ct. 20, 25, 165 A. 666, that a sound health clause is "a condition and not a covenant" and that "it operates more strongly in favor of the company than even a covenant in the policy that the answers to questions in the application shall be deemed warranties. It goes to the very heart or essence of the insurance contract."

We see no reason, therefore, why the effect of the passing of the insured in this case by the insurer's medical examiner should not be given the same effect here as was given to a similar passing in disposing of the Kudoba case.

The next defense interposed by appellant—the failure of the insured to disclose his visit to Dr. Savitz on November 9, 1934,—raises the serious question in this case under its motion for a new trial.

In the application are found the following questions and answers: "8(a) When and for what did you last

consult a physician? A. 1923—Operation, appendicitis. (b) Give the name and residence of such physician. A. Dr. McMillan, Meyersdale, Pennsylvania."

Upon consideration of the testimony above quoted, it may be said that appellant's proofs relative to the *fact* of a visit by the insured to the office of Dr. Savitz shortly prior to the date of the application and that he was there treated for an acute sore throat and influenza were not flatly contradicted.

Out of this testimony a material question arises: Were the ailments for which the insured was treated "grave, important or serious diseases," materially affecting his general soundness and healthfulness?

Appellant contends its proofs entitled it to binding instructions in its favor. This contention must be rejected, if for no other reason, because it is based solely upon the oral evidence of its own witnesses: *Evans v. Penn Mutual L. Ins. Co.,* supra, p. 560.

On the other hand, we think it equally clear that appellee was not entitled to binding instructions. The learned trial judge seems to have based the direction of a verdict in her favor upon the proposition that as appellant made no subsequent effort to contradict the testimony elicited when it called her for cross-examination it was bound by her answers and that this testimony contradicted that of Dr. Savitz which was "so vague, uncertain and indefinite as to have no evidential value." An examination of appellee's testimony in its entirety shows that, while she insisted the insured had consulted Dr. Savitz in the early part of 1935 for the grippe from which he and other members of the family suffered and procured medicine from him, she would not say definitely her husband had not gone to the office of Dr. Savitz in November, 1934. She also testified her husband, a farmer, had not been seriously ill from grippe but had been "at the barn every day."

It was not within the functions of the trial judge to

pass upon the credibility of Dr. Savitz, or of any other witness, and determine the consequent weight and value of their testimony. We are unable to see anything vague or indefinite in the above quoted testimony of Dr. Savitz relative to the fact of the visit by the insured to his office for consultation and treatment on November 9, 1934. The date of that visit was fixed by reference to the office records of the witness. (Record 57a) The credibility of this witness was for the jury.

In our opinion, the pleadings and evidence raise the following questions of fact upon this branch of the case which should have been submitted to the jury under proper instructions. First, whether the insured visited the office of Dr. Savitz as testified to by the latter? Second, if so, did that visit amount to a consultation with a physician within the meaning of the above quoted question in the application?

Answers to questions relating to prior medical attendance normally concern a fact material to the risk and a fact within the knowledge of the applicant. Hence, evidence of a failure to disclose a prior visit to a physician cannot be totally disregarded as was done in this case. But "the failure to report every attendance or treatment by a physician does not alone constitute fraud, as for instance where the application does not disclose attendance for headaches, grippe, acute colds, indigestion or other comparative minor illnesses": *Adams v. Metro. Life Ins. Co.,* supra.

Our decisions do not lay down the rule that where the visit was, in the opinion of the trial judge, for a minor ailment, he may instruct the jury to disregard the evidence altogether and find for the plaintiff.

Where there is uncontradicted documentary evidence that an insured has received prior treatment for a specified disease, a court may take judicial notice of the fact that the disease in question, for instance pernicious

anemia, is a serious disease. See *Roush v. Metro. Life Ins. Co.,* 116 Pa. Superior Ct. 162, 176 A. 809.

As the ailments for which the insured was treated in this case were not of the character of those involved in the Roush case, it was for the jury to say whether seeing a doctor about them amounted to "consulting" a physician, within the meaning of the contract. The questions asked about consultation with a physician were reasonable and their purpose obvious. An applicant for insurance may honestly not have known he was suffering from a serious disease. The actual nature of the disease could be ascertained only from the attending physician. One of the reasons an insurance company may be entitled to know about the fact of such a visit, is in order that it may communicate with the attending physician and learn the particulars from him. See *Wall v. Royal Soc. of Good Fellows,* 179 Pa. 355, 36 A. 748.

The correct rule to be applied in this case is that laid down in *McBride v. Sun Life Insurance Co.,* 90 Pa. Superior Ct. 35. That case had many features comparable to those here involved. In holding that it was for the jury and not for the court to decide whether the treatments received by the insured amounted to "attendance by a physician," it was said:

"One would scarcely contend that every dressing of an injured or infected finger, or every prescription for a cold, or treatment by a throat specialist could properly be classed as 'attendance by a physician,' when the patient shows no other signs of illness, or is not sick in bed or confined to the house. A reasonable construction must be placed on the term, just as is given to the statement that the applicant is in 'sound health' or 'good health': *Horne v. John Hancock Mut. Life Ins. Co.,* 53 Pa. Superior Ct. 330, 333; *Barnes v. Fidelity Mut. Life Assn.,* 191 Pa. 618, 623. In such case it does not mean absolute perfection of health, but only

that the applicant has no grave, important or serious disease and is free from any ailment that seriously affects the general soundness and healthfulness of the system. The question here involved followed immediately after an inquiry as to whether the applicant had ever had any of a number of specified serious diseases. In some jurisdictions it is held that merely calling on a physician, or being called on by him, because of a temporary indisposition, not serious in its nature and not affecting the person's sound bodily health is not being 'attended' by a physician within the meaning of such word in an application for insurance: *Plumb v. Penn Mut. Life Ins. Co.*, 108 Mich. 94, 99; 65 N. W. 611; *Brown v. Metropolitan Life Ins. Co.*, 65 Mich. 306, 310, 32 N. W. 610; *Billings v. Metropolitan Life Ins. Co.*, 70 Vt. 477, 41 Atl. 516. See also *Gibson v. Am. Mut. Life Ins. Co.*, 37 N. Y. 580, 582. On the other hand, it is not in all cases necessary that the patient be 'attended' at his home by the physician; he may be 'attended' at the latter's office; *White v. Provident Savings Life Assurance Soc.*, 163 Mass. 108, 116, 39 N. E. 771; *Cushman v. U. S. Life Ins. Co.*, 70 N. Y. 72, 78. But where, as here, the physician is a city official whose duty is to look after the health of city employees, examine into their physical condition and pass upon their ability to work, and it is shown that an employee under his general care, a healthy and robust looking man, not sick in bed nor confined to the house, receives from the doctor no prescription or internal medicine, but only a throat treatment such as is given for an ordinary cold in the larynx, we think it is for the jury to find, and not for the court to declare as matter of law, whether such treatment amounts to 'attendance by a physician,' within the common acceptation of the term."

Our conclusion is that the issues above outlined and discussed under this branch of the case should have been submitted to the jury and that the trial judge,

therefore, erred in directing a verdict for appellee and entering judgment thereon. The seventeenth and eighteenth assignments are sustained and a new trial will be directed.

As the case must be retried it is proper that we express our opinion with relation to the first ground of defense relied upon by appellant, viz., that appellee cannot recover in this action because she failed to show she had exhausted her appeals and remedies within the order. Upon this subject appellee testified: "Q. Mrs. Engle, were you notified more than once that the claim would not be paid? A. I was twice; a man was at the house twice and notified me. Q. How long apart were those visits would you say? A. I believe it was at least two months apart, or six weeks anyways. Q. After you were notified that the claim would not be paid, did you make an appeal to the organization? ...... A. I don't believe I did."

A. M. Fording, appellant's assistant general manager, testified on direct examination: "Q. Was there a claim presented in this case? A. Yes, sir. Q. Was the claim denied? A. Yes, sir. Q. Will you state why? A. Because the evidence showed on the proof of death, it didn't tally with the answers made by the applicant in his application for that insurance policy." Upon cross-examination he said: "Q. Did you or any member of the organization to your knowledge furnish Mrs. Engle with a copy of the constitution and by-laws or charter of the organization? A. No, but her husband was. Q. I asked if any one furnished it to Mrs. Engle? A. We didn't."

The contract of insurance or certificate provides in part that "the Certificate, the Charter of Incorporation of the National Council Junior Order United American Mechanics of the United States of North America, the Constitution and Laws thereof, with all amendments thereto, the application for membership in the Bene-

ficiary Degree, and the medical examination, signed by said member, shall constitute the agreement between the said National Council and the member." A document of 199 pages entitled, "Constitution and National Laws" was introduced in evidence. On page 150 of this Exhibit (in Division VII of the National Laws pertaining to the Beneficiary Degree) appears General Section 489 entitled, "Proof of Death." The section provides in substance that all proofs of death shall be acted on by the Chief Medical Examiner, and that a warrant shall issue when the claim is approved by him and the General Manager of the Beneficiary Degree and when certified as correct by the Assistant General Manager; and if any claim is disapproved, the Assistant General Manager is to notify the claimant, who is given sixty days to appeal to the "Board of Control."

General Section 461 of the National Laws provides that the decision of the Board of Control shall be final unless appealed to the "National Judiciary," which appeal must be taken within ninety days from the date of notice of the decision of the Board of Control.

General Section 494 provides:

"Action At Law

Gen. Sec. 494, Sec. 54, No action at law or in equity shall be brought or maintained in any court by a member, his beneficiary or beneficiaries on any claim or cause arising out of membership in the Beneficiary Degree until all appeals or remedies within the Order have been exhausted, and unless such action is brought within six months of the time when such claims have been finally disallowed by the National Judiciary, all rights under said claim are thereby forfeited."

The application for the policy, signed by the insured, contained the substance of Section 494. No such provision, however, appears in the certificate itself; and neither the application nor the certificate contains any summary of or reference to the provisions of Sections

461 or 489. Furthermore, it is admitted that neither the application nor the Constitution and National Laws was attached to or physically made a part of the certificate; that no copy of either the application or of the Constitution and National Laws was ever furnished to the appellee; and that, as shown by the above quoted testimony, the particular provisions making compulsory the preliminary appeals within the Order were never in any manner brought to her attention. On the contrary, the claim, so far as appellee knew, was definitely and finally rejected by appellant.

If this were an ordinary policy of insurance, appellant would have no ground of complaint, because of the provisions of Section 318 of the Insurance Company Law of May 17, 1921, P. L. 682, 40 PS §441. This section provides that neither the application nor the Constitution or By-Laws of the Company shall be considered a part of the contract between the parties unless they are attached to and accompany the policy. It is true that the clause in question does not apply to death certificates of fraternal benefit societies (see Act of May 20, 1921, P. L. 916, Sec. 2, 40 PS §1012); but the question nevertheless arises in each case whether the fraternal organization has merely issued a certificate of membership with incidental death benefits, or is in fact carrying on a general insurance business. If the organization is actually carrying on an insurance business, then it will be bound by the general laws applicable to the life insurance business. See *Marcus v. Heralds of Liberty*, 241 Pa. 429, 88 A. 678; *Hatfield et al. v. Sov. Camp, W. O. W.*, 129 Pa. Superior Ct. 570, 196 A. 904.

There is much in the so-called certificate and the application therefor which suggests that appellant was doing a commercial insurance business. If such were the case, the application for the policy and the National Laws of the organization would not be effective to de-

feat recovery. Since, however, the point was not considered either in the court below or in the briefs and arguments before this court, we prefer to hold against appellant on a broader ground. It is a well-established rule that a contracting party by his conduct may render inoperative conditions of the contract on which he might otherwise insist. Thus, it has been held that a provision requiring the filing of proofs of loss is waived where a denial of liability has been made. So also a denial of liability renders ineffective a clause requiring the insured to wait a certain period before bringing suit. We are of opinion that the same principle should be applied to this case.

If appellee read the certificate, she would only have been informed in general terms that the application and the laws of the order formed a part thereof. There was nothing in the policy which stated or even intimated that these laws contained a provision requiring her to take two successive appeals within the order, and within a specified time, upon penalty of forfeiting all right of action. Under these circumstances, she had a right to assume that when her claim was definitely and unequivocally rejected, her only recourse was that of the usual suit at law. If the rejection by the Chief Medical Examiner and the General Manager was not a final one so far as the order was concerned, but was subject to review, then appellee was entitled, under the above quoted rule, to be informed of this fact in order that she might govern herself accordingly. It is only common decency to require that the representatives of the order comply with the procedure established by its rules and regulations. We do not consider the very general reference to the National Laws in the body of the certificate a reasonable notice of the effect of the initial rejection. The existence of further proceedings within the order should therefore have been communicated to the appellee as a part of and in explanation of the

nature of the rejection. As this was not done and since the rejection was in terms a final ·one, we now hold that the provisions for appeals within the order were waived.

We have considered the cases cited by appellant on this point, but do not consider them applicable. *Acri et al. v. Bruscia et al.* 265 Pa. 384, 108 A. 717, and *Robinson v. Harshaw,* 63 Pa. Superior Ct. 482, involved questions of expulsion from fraternal organizations. In those cases it was proper to assume that the members were familiar with the provisions of their own constitution and by-laws. In the present case we are dealing with a beneficiary who had no connection with the order except in so far as she was made a beneficiary under one of its contracts. *Lafferty v. Supreme C. C. Mut. B. Assn.,* 259 Pa. 452, 103 A. 280, had to do with the length of time which must expire before the beneficiary could make a claim for the loss of a husband who had disappeared, and that case does not present an analogous situation. In *Beeman v. Supreme Lodge,* 29 Pa. Superior Ct. 387, it is true that one of the reasons given for a denial of recovery was the failure of the beneficiary to take an appeal within the order from a refusal to pay death benefits. However, we there said (p. 397) that compliance with the pertinent provisions was unnecessary if they were waived or if compliance was prevented in any way by the order. For the reasons above stated, we think the exception therein referred to is applicable here.

The second and eleventh assignments, based upon the refusal of the court below to charge that appellee was bound to show she had exhausted her remedies within the order, and the fourteenth and fifteenth, alleging error in refusing appellant's point for binding instructions and in admitting the testimony of Dr. Savitz upon

cross-examination (Record p. 58a), are severally over-ruled.

Judgment reversed with a venire.