Belmont Laboratories, Inc., Appellant, *v.*
Heist et al.

Argued April 22, 1930. Before MOSCHZISKER, C. J., FRAZER, WALLING, SIMPSON, KEPHART, SADLER and SCHAFFER, JJ.

*Owen J. Roberts,* with him *Laurence H. Eldredge* and *Charles A. Wolfe,* for appellant.—The findings of fact

of a chancellor have the same force as the verdict of a jury and should not be overturned if there is evidence to sustain them. Within the past few months this court has reversed the action of a court in banc in finding facts contrary to those found by the chancellor because of the rule just laid down: Thorndell v. Munn, 298 Pa. 1, 3; Glenn v. Trees, 276 Pa. 165; Clothier v. Hoffman Co., 261 Pa. 83; Duffey v. Jennings, 247 Pa. 388.

The evidence overwhelmingly established that the formula for Mazon is a secret formula, is valuable, and is owned by plaintiff.

The character of the secrets, if they be peculiar and important to the business, is not material; they may be secrets of trade, or secrets of title, or secret processes of manufacture, or any other secrets important to the business of the employer: Macbeth-Evans Glass Co. v. Schnelbach, 239 Pa. 76.

Defendant Heist unlawfully obtained the formula for Mazon while employed as an officer of plaintiff.

Plaintiff is clearly entitled to an injunction and accounting: Macbeth-Evans Glass Co. v. Schnelbach, 239 Pa. 76; Fralich v. Despar, 165 Pa. 24; Simone v. Springer, 65 Pitts. L. J. 472; Withrow Steel Co. v. Oberlin, 76 Pitts. L. J. 268.

*Earl G. Harrison,* with him *Saul, Ewing, Remick & Saul,* for appellee.—While great weight is to be given to the findings of the chancellor, "it is the duty of the court in banc to review carefully such of the findings of fact of the chancellor as have been made the subject of exceptions": Thorndell v. Munn, 298 Pa. 1.

There is no question but that any chemist or pharmacist could make an analysis and any layman could have an analysis made of Mazon and then put out an identical product and plaintiff would have no complaint or remedy: Dr. Miles Medical Co. v. Park & Sons Co., 220 U. S. 373.

Plaintiff is not entitled to an injunction even though defendants are using the same formula, which is strenuously denied, because there is no trade secret or secret process which plaintiff is entitled to have protected; the three elements on which plaintiff relies, a greaseless base carrying mercury and phenols as curative agents, were disclosed to the world the minute the preparation was sold: Eastman Co. v. Reichenbach, 20 N. Y. S. 110.

OPINION BY MR. JUSTICE WALLING, May 27, 1930:

Some ten years ago, William H. Gross, an experienced phramaceutical chemist of Philadelphia, after many trials extending over a period of two or three years, perfected a remedy for eczema and other skin diseases, which he called Mazon. It proved superior to any other known remedy for skin diseases and was often prescribed by physicians. Mazon is a mecurial-phenol compound with a sodium-stearic greaseless base. It is prepared upon a formula which Mr. Gross kept secret. The secret consists not in the chemical elements used in its preparation, but in the quantities of each used and the manner of combining and compounding. Mazon was slow in gaining recognition, and Gross lacked funds to properly place it upon the market, therefore early in 1926 he, having been introduced to the defendant, Stuart H. Heist, arranged with him to furnish capital and join apparently as a partner in the business. In June of that year they secured a Delaware charter under the name of Belmont Laboratories, Inc., with principal offices in Philadelphia. During that month Gross and Heist transferred to the new corporation their entire interest, inter alia, in Mazon, including property, good will, formula, etc., for which Gross and Heist each received one thousand shares of the stock of the corporation, which comprised its entire issued capital stock. Heist gave one share of his stock to John B. Keenan, Jr., and the three became directors. Gross was made president and Heist screetary and treasurer. Differences

arising among the three, Gross and Keenan joined against Heist and discharged him as secretary and treasurer. Thereupon, in 1927, he went to New York City, took out a charter for a new corporation called Whitney-Payne Laboratory, Inc., and began the manufacture and sale of a remedy for eczema and other skin diseases called Pheno-Cosan. Plaintiff, contending that this was in reality Mazon, filed the bill in this case, praying for an injunction to restrain Heist and his corporation, inter alia, from so doing; also averring that he had obtained the secret formula for the preparation of Mazon while in plaintiff's employ and hence could not disclose or use the same. An answer was filed denying the controlling averments of the bill, and, at the trial before the chancellor, testimony was submitted by each party. The chancellor made extensive findings of the facts and drew legal conclusions, all in favor of the plaintiff, and entered a preliminary decree granting it the relief prayed for. The defendants filed sixty-two exceptions; these were heard by the court in banc, at which the chancellor, because of illness, did not sit. Thereupon the court in banc filed an opinion strongly concurring in the defendants' contention as to both facts and law and entered a sweeping final decree sustaining all the exceptions and dismissing plaintiff's bill. Therefrom the latter brought this appeal.

The case hinges primarily upon the facts and the first question is, Shall we accept them as found by the chancellor or by the court in banc? The rule is clear that where the chancellor's findings are affirmed by the court in banc we are concluded thereby, where such findings were supported by proof sufficient to require their submission to the jury in a trial at law: More v. Peoples Bank & Trust Co., 297 Pa. 252; Robb et al. v. Stone et al., 296 Pa. 482; Fidelity-Phila. Tr. Co., Exr., v. L. V. Co., 294 Pa. 47, 54; Miller v. Central Tr. & Sav. Co., 285 Pa. 472; Miller's Est., 279 Pa. 30, 37; Glenn v. Trees et al., 276 Pa. 165; Warner v. Hare, 154 Pa. 548.

Where the proof, however, was insufficient to submit to a jury the findings cannot be sustained: Hamilton et al. v. Fay, 283 Pa. 175. On appeal, the chancellor's findings, however, do not have the same conclusive force when, as in the instant case, they were overruled by the court in banc. Even then the chancellor's findings, where as here depending upon conflicting oral evidence, given by witnesses which he saw and heard, must receive great weight. In the very recent case of Thorndell, Admrx. et al. v. Munn, 298 Pa. 1, Mr. Justice SIMPSON, speaking for the court, says (page 3) : "The nature of the principal differences of fact between the chancellor and the court in banc, again compels us to call attention to the well-settled rule that though it is the duty of the latter to review carefully such of the findings of fact of the former as have been made the subject of exceptions (Worrall's App., 110 Pa. 349; Miller's Est., 279 Pa. 30; Gehringer v. Erie Rys. Co., 297 Pa. 47), yet great weight is to be given to those findings in cases where, as here, they depend, in large degree, on the credibility of witnesses whom he saw and heard, and whose testimony, for that reason, he is best able to weigh (Clarkson v. Crawford, 285 Pa. 299, 303; Hall & Co. v. Lyon, Singer & Co., 286 Pa. 119; Phillips's Est., 295 Pa. 349), as the tone and manner of a witness not infrequently indicate whether or not he is telling the truth." See also Duffey v. Jennings, 247 Pa. 388, 391; Crick v. Paull et al., 287 Pa. 431. The court in banc can properly disregard such findings only in a clear case and then by putting upon record its reasons for so doing. See Griffin's App., 109 Pa. 150; Jeane's App., 116 Pa. 573; Morgan's App., 125 Pa. 561. In the instant case the court in banc gives reasons for its action, but they are not convincing, and, as neither that court nor this saw or heard the witnesses, we are in as good a position as it to weigh the evidence: Rutter v. Rutter, 292 Pa. 343, 346; Gilbraith's Est., 270 Pa. 288. Futhermore, under the former practice, the court could only reverse the mas-

ter's findings of the facts in a clear case. See Mirkil v. Morgan, 134 Pa. 144; Helb v. Hake, 203 Pa. 626. Where reasons are so given, it becomes the duty of an appellate court to fully and carefully examine them, together with the entire record, and determine whether the action of the court in banc is justified, keeping in mind the weight to which the original findings are entitled and also the reasons given for their overthrow. So doing, we have reached the conclusion that the action of the court in banc cannot be sustained.

The testimony of the chemists called by the respective parties as to whether Mazon and Pheno-Cosan were substantially the same, differed. Dr. Harrison and Dr. LaWall, who made chemical analysis of each preparation for plaintiff, said they were practically identical, Dr. LaWall saying they were made from a very closely agreeing formula or by an identical formula, and Dr. Harrison that they were practically the same composition. We are not impressed with the statement of the court in banc to the effect that the testimony of the chemists called by plaintiff is too indefinite to have probative value. For the defense, Dr. Sadtler, a chemist, who examined the products for the defendant, said he found a number of dissimiliarities in the two products, which he described. Dr. Simpson and Dr. Pearson, chemists, upon being shown a list of the ingredients supposed to be contained in each preparation, testified to decided differences. Sadtler's analysis, however, was made from specimens of supposed Pheno-Cosan furnished him by the defendant, Heist, two weeks before the trial and there was but his evidence that it was identical with Pheno-Cosan as manufactured by him, and there was only his word that the list he furnished of its ingredients was accurate. In fairness, it should also be stated that the specimen of Pheno-Cosan examined by Drs. Harrison and LaWall was furnished by Gross. So, in addition to the credibility of the respective chemists there is the question of the credibility of

both Gross and Heist. Seeing these witnesses and listening to their testimony gave the chancellor a great advantage over the court in banc. Furthermore, plaintiff's case was strongly corroborated by other evidence. Heist, who was not a chemist, came into the business to furnish capital (just how much he furnished was not shown) and assist in marketing the product. It does not appear that he was to take part in its manufacture or be possessed of the secret formula. He was to be the office manager; yet he frequently visited the laboratory, without any apparent reason, and watched Gross making the product. Gross took great pains to keep his formula secret and had only two written copies thereof —one he kept locked in a drawer in his desk in the office and the other was deposited in the Corn Exchange National Bank. Heist had access to the desk, but not to the locked drawer, but, on returning from a vacation, Gross found the drawer open and the copy of the formula left therein gone. This was in August, 1926, and during the same month Heist told Keenan as the latter testified and as found by the chancellor: "Q. Just what did Mr. Heist say? A. He came and said, 'Well, now, John, I told you that sooner or later I would have something good, and something in which there could be some money made,' and he says, 'Now, I have it. I have the formula for Mazon, and all we have to do is kick this bird out.' Q. Referring to whom? A. Referring to Mr. Gross, and he says, 'We will have this thing for ourselves.' And I said, 'Now, I don't think that is possible,' and he says, 'Do you want it?' and I says, 'No.'" James Francis Ryan, Esq., of the Philadelphia Bar, testified concerning a talk he had with Heist during the same month, as follows: "Mr. Heist was alone, and he and I talked over the matter of the importance of the product, Mazon. He told me at that time, 'I am not so dumb as I look. I have got the formula. I can make that stuff any time.' Q. Referring to what? A. Mazon. And he also said that Mr. Gross was too dumb to know any-

thing about the matter, and that he was going to get rid of him, and that he and Mr. Keenan were going to make Mazon." Heist testified at length, but failed to deny either of the above quoted statements, but did deny having possession of the Mazon formula.

Heist's explanation of how he prepared the formula for Pheno-Cosan is far from convincing. It is that he got a chemist named Simpson to give him a formula for a greaseless base and then by reading, talking with physicians and making experiments worked out the formula from which Pheno-Cosan is prepared. Chemists testified to the effect that it would be next to an impossibility for a layman to accomplish this. In our opinion, the court in banc gave undue weight to the fact that the bill here filed contains some averments not mentioned in an earlier bill filed in the United States Court for the same cause, but the added averments may not have been known or in mind when that bill was filed. And also gave undue weight to the fact that, in connection with a business transaction, Gross exhibited an incorrect formula for Mazon. This doubtless was to avoid disclosing the true formula. We are satisfied, however, from the entire evidence that the chancellor's finding that Pheno-Cosan is a substantial reproduction of Mazon and made from the same formula, is right. There are some unimportant changes and certain substances added calculated probably to cast doubt upon it, as was the employment of Simpson to prepare a greaseless base.

As above stated, the secret of Mazon is not in the ingredients of which it is composed, but in the manner in which they are combined and compounded. The evidence supports the conclusion that it could not be made even by a skilled chemist, after a full analysis, without the formula. This is a secret process to which plaintiff as a purchaser is entitled. Where chemists unite agencies, the particular properties of each of which, apart, are well understood, but the combination results in producing something not previously known, which has a

new or superior use, it is an invention to which, as a trade secret, a proprietary right may attach: Eastman Co. v. Reichenbach, 20 N. Y. S. 110.

The sale of the right to prepare, own and sell Mazon by Gross and Heist to the plaintiff was averred in plaintiff's bill and admitted in the defendants' answer; hence, the written agreement relating thereto was not offered in evidence. But after the proofs were closed for defendants, they asked that the case be opened that they might formally offer this agreement. This request might properly have been granted and, as the agreement is printed in the record, we have examined it but find nothing therein helpful to the defendants. It provides, inter alia: "That the vendors [Gross and Heist] have sold, assigned, transferred and set over, and do hereby sell, assign, transfer and set over unto the company, its successors and assigns, all right, title and interest in and to the following described property, to wit: 'All that certain equipment, stock, merchandise, book accounts, registered trade name "Mazon," registered trade name "Kalex," and all the formulæ that they may now have, or have in contemplation, or may hereafter invent, and the good will, trade and custom of the business now carried on by them at 4430 Chestnut Street, Philadelphia, Pa., subject to outstanding business indebtedness.'" After such a sweeping assignment, neither of the vendors had any right to manufacture Mazon or disclose the secret process. As vendors under such an agreement they were estopped from so doing.

Again, Heist acquired knowledge of the secret process while in plaintiff's employ, and therefore he can neither use nor disclose it. This rule is clearly shown in Macbeth, etc., Co. v. Schnelbach et al., 239 Pa. 76. The Macbeth Company had a secret process for the manufacture of "Alba" glass which Schnelbach acquired while in its employ, and which, after quitting such employ, he was restrained from using or disclosing. That case is a controlling authority here under the facts as the chancellor

found them. Williston on Contracts, volume 3, section 1646, page 2901, says: "The law recognizes a right of property in trade secrets. As such property loses its only value if the secret is disclosed, any one who acquires knowledge thereof in a confidential capacity, as that of an employee, is under an obligation, which equity will enforce, not to disclose the secret or use it for his own advantage, even if he makes no express contract to this effect. It necessarily follows that express contracts which prohibit the disclosure by those entrusted with knowledge of them are valid and may be as broad as is necessary to protect the owner from injury by the disclosure of the secret or its competitive use. Especially, contracts by employees may restrain them from disclosing secrets of their employment, and the owner of a secret, on selling it, may effectively promise not to compete by making use of the process himself or divulging it to others. Indeed the sale of a secret process as such carries with it the implied obligation not to disclose it to others." And see 32 C. J. page 159. Nims on Unfair Competition, 3d ed., section 156, page 427, states: "Whether nominated in the agreement of the transfer or not, the vendor of a secret will not be allowed to impart the secret to a third person after the transfer. The law holds the right conveyed to be exclusive even of the vendor himself, and an injunction will issue against the vendor, or any of his family or associates who learn the secret through their relations with him, forbidding them to disclose it. Where a secret formula had been sold and, four years after the sale, the wife of the vendor gave the formula to her son, its use thereafter by the son was enjoined." Stone v. Goss, 55 Atl. (N. J.) 736, states the principle, that "One who is under an express contract, or a contract implied from a confidential relation, not to disclose a trade secret, will be enjoined from disclosing the same." The rule is stated in Simmons Medicine Co. v. Simmons, 81 Fed. (Ark.) 163, thus: "Equity will not permit one, who has sold for a valuable

consideration the absolute and exclusive property in a medicine compounded by a secret process, to reveal such secret to a third person, either by himself, or through a member of his family, and will restrain by injunction the use of a secret so revealed." The English case of Morison v. Moat, 9 Hare 241, 68 English Reports, Full Reprint, page 492, holds that one who, while a partner had acquired knowledge of a secret process for compounding medicine not patented, should be restrained from the use thereof to the damage of the original compounder. That in the instant case Heist acquired the knowledge surreptitiously, as the chancellor found, certainly adds nothing to his rights; for one who has obtained knowledge of a secret process of manufacture through fraud or bad faith will be restrained from using it: 32 C. J. 158. The secret process was acquired by Heist while in plaintiff's employ and, regardless of the manner of its acquisition, he was under an implied obligation not to disclose it or to use it for his own purposes.

That at the trial plaintiff declined the defendants' offer to make samples of the preparations in presence of chemists is not to the point. This might tend to disclose the secret process and in addition the article so made in demonstration might not be genuine.

Plaintiff acquired the secret process in a perfectly fair and legitimate manner and paid the consideration therefor according to the agreement. As to that, plaintiff comes into equity with clean hands and is not barred of relief because in some subsequent matter it, acting through the majority stockholders, may have treated the defendant, Heist, unjustly; for this he is entitled to and has invoked another remedy. The rule that he who comes into a court of equity must come with clean hands, is limited to the transaction under investigation. In D., L. & W. R. R. v. Stroudsburg, W. G. St. Ry., 289 Pa. 131, Mr. Justice SCHAFFER, speaking for the court, says (page 138): "Equity would not stand aside the one

whose rights were transgressed and permit them to be appropriated because of his previous bad conduct. 'When a court of equity is appealed to for relief it will not go outside of the subject-matter of the controversy and make its inference to depend upon the character and conduct of the moving party in no way affecting the equitable right which he asserts against the defendant or the relief which he demands': Pomeroy's Equity Jurisprudence, 3d ed., volume 1, section 399; Comstock v. Thomson, 286 Pa. 457, 461; Dempster v. Baxmyer, 231 Pa. 28; Lewis & Nelson's App., 67 Pa. 153, 166." It must be wilful misconduct in the very matter in litigation: Schaeffer v. Jones et al., 293 Pa. 529; Dempster v. Baxmyer, supra; Englander v. Apfelbaum, 56 Pa. Superior Ct. 145; 21 Cyc. 187. Even proof of misconduct as to one part of a transaction will not necessarily deprive a party of equitable relief as to another part thereof: Comstock v. Thompson, supra. The subject here involved is the ownership and right to use or disclose a secret process, not the rights of stockholders in the corporation. The opinion of the court in banc criticises the chancellor for failure to answer certain requests submitted by the defendants and appellees' printed brief contains a like criticism. These were based on misinformation, for appellees' counsel now frankly admits that all the requests were answered.

The final decree sustaining the exceptions to the chancellor's adjudication and dismissing plaintiff's bill is reversed and the bill is reinstated, the exceptions are dismissed and the record is remitted to the trial court to enter a final decree awarding an injunction and an accounting in accordance with the nisi decree of the chancellor. Costs to be paid by appellees.