Kahn *v.* Griscom et al., Appellants.

Argued October 15, 1940.

Before KELLER, P. J., CUN-
NINGHAM, BALDRIGE, STADTFELD, PARKER, RHODES and
HIRT, JJ.

*Rutledge Slattery,* with him *Joseph A. Slattery,* for
appellants.

*Harry Norman Ball,* for appellee.

Opinion by Stadtfeld, J., March 1, 1941:

This is a suit in equity against an unincorporated beneficial association. The bill alleged membership in the association and performance of all terms and conditions of membership by plaintiff and claimed sickness benefits to be due him from July 28, 1938, under the association by-laws on account of an alleged permanent disability for work by reason of tuberculosis. The answer admitted membership of plaintiff in the association up to June 29, 1938, averred termination of membership on that date by reason of termination of plaintiff's employment with Abbotts Dairies, Inc., denied that plaintiff was incapacitated for work at that time, and denied that he had ever since that date performed any term or condition whatsoever of association membership. The case was tried upon these pleadings before Oliver, P. J., sitting as a chancellor.

The defendants and those they represent are organized as "The C. R. Lindback Foundation" (hereinafter called the "Foundation"), an unincorporated beneficial association of employees of Abbotts Dairies, Inc., for the purpose inter alia of providing weekly monetary benefits for member employees incapacitated for work by sickness, in consideration of weekly membership dues and on terms and conditions set forth in controlling by-laws.

Plaintiff, Nathan Kahn, who had been employed by Abbotts Dairies, Inc., as a milk wagon driver, since November 1931, became a limited member of the Foundation in June 1932; and later, in March 1934, following establishment of a "Full Beneficial" membership carrying sickness benefits, he became a "full beneficial" member. The by-laws of the defendant Foundation, on the subject of payment of sickness benefits, provide that such benefits shall be the full weekly salary earned by the member (not to exceed $50 per week) and that such *benefits shall be payable while employee is in-*

*capacitated* by reason of sickness or accident incurred in the usual pursuit of duties for the company.

In November 1935, plaintiff became incapacitated for work by reason of an illness diagnosed as active tuberculosis of the lungs. Dr. Langbord, a specialist in tuberculosis, had plaintiff admitted to Deborah Sanatorium in January 1936. Following his discharge from the sanatorium in January 1937, plaintiff did not return to work but instead remained throughout the year 1937 and into February 1938 at his home. From March 1937 to January 1938 he had as his tuberculosis specialist, Dr. Nathan M. Noble at Deborah clinic in Philadelphia. While at home during that time, he reported regularly to the defendant Foundation in person and by written report from Dr. Noble's clinic.

Dr. John W. Welty, the tuberculosis specialist in charge of plaintiff at Eagleville Sanatorium where Kahn had gone for observation, discharged him from Eagleville on May 12, 1938, diagnosing his condition as one of apparent arrest. On the day following his discharge from that sanatorium (May 13, 1938) plaintiff reported to Dr. S. E. Tracy, the Foundation medical director. At that date, he wanted to go to work. Dr. Tracy, however, did not send him back to the employer company, but told him to go home and come back in a month. In the interim, Dr. Tracy wrote Dr. Welty, who replied (May 31, 1938) that plaintiff might return to work whenever there was an available opening for him. Two weeks later, June 14, 1938, when plaintiff returned to the Foundation clinic, he told Dr. Tracy that he would like to go to work. Dr. Tracy then and there gave plaintiff a letter to the employer quoting Dr. Welty's conclusion that plaintiff was able to work. J. A. Webb, the company official to whom this letter was addressed and to whom plaintiff took it, discussed the matter with plaintiff's department head, the sales manager. On the occasion of this first meeting in the employer's offices, plaintiff still wanted to work and

said so. Two weeks later, June 29, 1938, plaintiff called to see E. K. Schwartz, head of milk sales of Abbotts, in response to a letter from Mr. Schwartz to come in. In the meeting, attended also by A. S. Dwyer, the Foundation Secretary, Mr. Schwartz, for Abbotts Dairies, Inc., told plaintiff that Dr. Welty had reported him able to return to work and Mr. Schwartz suggested to him that a return to a milk wagon might not be advisable for his future health. After conversation along this line, plaintiff also, according to Messrs. Schwartz and Dwyer, said he did not think it best for his health to go back to milk wagon work. Plaintiff, at this time received a check for four full weeks' wages, which the president of the company had directed to be given to him as a customary honorarium on honorable termination of employment. On June 27, 1938, prior to the foregoing meeting, the company had written to A. S. Dwyer, secretary of the defendant Foundation, that Dr. Welty reported plaintiff able to return to work, and had recommended, therefore, that his Foundation benefits be stopped.

At some date after August 16, 1938, after receipt of a letter from an attorney claiming benefits on behalf of plaintiff, the Foundation denied liability to pay plaintiff anything, stating as reasons that when benefits were terminated, plaintiff had not been incapacitated for work and also that he was not a member of the Foundation after June 29, 1938, his membership having terminated under the by-laws when his employment with Abbotts Dairies terminated.

The chancellor made, inter alia, the following findings of fact: "21. From the time he (Kahn) left the sanatorium, in May of 1938, until the present time, he has done no work, has engaged in no business for gain or profit and has earned nothing. 22. Since May of 1938 and to the time of trial, plaintiff has lost weight, has always been tired, is short of breath, perspires easily, expectorates constantly, requires rest periods in

bed during the day and has been required to go to bed early in the evening ...... 24. In May or June of 1938 plaintiff was still suffering from the same disease. 25. In September of 1938, plaintiff was still suffering from the same disease in the quiescent form. 26. In September of 1939, plaintiff was still suffering from pulmonary tuberculosis and upon examination showed a moderately advanced exudative tuberculosis of both upper lobes with suspicion of tiny excavations which is an active tubercular condition. 27. Plaintiff has been afflicted with tuberculosis from September of 1935 until the present date. 28. In May or June of 1938, plaintiff was not capable of performing the duties of a milk wagon driver. 29. In May or June of 1938, plaintiff was not capable of performing any of the duties of any occupation which he ordinarily had been capable of performing. 30. A patient in the condition of 'apparent arrest' could not physically do a normal day's work. 31. An attempt to do active work on plaintiff's part in May or June of 1938 would seriously have endangered his health and tended to shorten his life. 32. In May or June of 1938, after dismissal from Eagleville Sanatorium, plaintiff, in spite of his condition, was anxious to return to work. He was advised by officials of Abbotts Dairies, Inc. to get a letter from Dr. Welty, the physician who had charge of his case at the Eagleville Sanatorium, to the effect that 'You are all right' and he was assured by said officials that upon producing such letter, he would be put back to work. 33. In reliance upon that advice and assurance, plaintiff importuned Dr. Welty to write such a letter to the Foundation. 34. Dr. Welty told plaintiff that he was not capable of working, but nevertheless, as a result of plaintiff's importuning, wrote a letter saying that plaintiff could do light work. 35. By 'light work,' Dr. Welty meant work of the kind given tuberculosis patients to 'test' their ability to work, such work being known as a therapeutic work test ...... 37. When plaintiff pro-

duced the letter which he was advised to get as aforesaid, he was not given work of any kind by Abbotts Dairies, Inc., and the Foundation promptly stopped paying benefits to plaintiff. In cutting plaintiff off of benefits, defendant relied solely upon said letter from Dr. Welty which stated that plaintiff's condition was 'completely' arrested. 38. The physician who wrote that letter admits that he meant 'apparently' arrested and that the word 'completely' was a stenographic error. The fact that such stenographic error had been made was known to defendant before the trial of this cause ...... 40. The officers of the Foundation acted in concert with the officers of Abbotts Dairies, Inc., to lead plaintiff to believe that, upon the receipt of a letter from Dr. Welty, to the effect that he was ready for work, Abbotts Dairies, Inc. would immediately put the plaintiff back to work, but the Foundation and Abbotts Dairies, Inc. had no intention of putting plaintiff back to work because they knew he was physically incapable of working as a driver of a milk wagon or of doing any similar work and their sole object in advising plaintiff to secure such a letter from Dr. Welty was to furnish them with a basis for dismissing plaintiff as an employee and cancelling his benefits from the Foundation ...... 46. On June 30, 1938, the sales manager of Abbotts Dairies, Inc., to whom plaintiff had been sent for re-employment, sent a letter to Dr. Tracy, Medical Director, from Mr. Dwyer of defendant Foundation, saying 'He accepted this decision (discharge) very favorably ...... therefore in answer to your memo, Foundation benefits have been stopped,' indicating the deliberate concert of action between defendant Foundation and Abbotts Dairies, Inc. 47. Benefits cannot be cut off by the Foundation unless recipient is fully cured and able to perform the duties of his occupation. 48. On September 21, 1939, an examination of plaintiff's sputum revealed the presence of tubercular bacilli and a 'positive report' was issued by

the official bacteriologist of the City of Philadelphia, who made the examination ...... 51. The sickness of plaintiff and his incapacity for work has continued uninterruptedly from 1935 through May and June of 1938 and down to the time of trial. 52. The by-laws of defendant, as interpreted by Mr. Lindback, president of Abbotts Dairies, Inc., provide that a tubercular patient is entitled to receive benefits until he is cured or dies. 53. The interpretation of the by-laws by the physician and medical director of the Foundation is that benefits are payable to a member until he completely recovers from the disabling sickness and is cured. 54. Plaintiff did not voluntarily terminate his employment with Abbotts Dairies, Inc. 55. The attempted discharge of plaintiff was solely and exclusively the act of the Foundation and Abbotts Dairies, Inc. without any action or acquiescence on the part of plaintiff, and was part of a concerted effort of the Foundation and the Dairies to take advantage of plaintiff and deprive him unjustly of his right to receive further benefits. 56. Incapacity by reason of sickness means the inability on the part of the member, because of the sickness, to perform the duties of his usual occupation. 57. Plaintiff was incapacitated within the meaning of the by-laws in June of 1938 and thereafter."

In the conclusions of law, the chancellor states: "6. The interpretation by Mr. Lindback, president of Abbotts Dairies, Inc., that a tubercular patient is entitled to receive benefits until he is cured or dies, and the interpretation of the by-laws by the physician and medical director of the Foundation, that benefits are payable to a member until he completely recovers from the disabling sickness and is cured, are binding upon the defendant. 7. The sick benefits to which the plaintiff was entitled was the sum of $45.85 per week from which the Foundation, in accordance with its established custom, is entitled to a deduction of $1.25 per week for dues."

The defendant appellant filed 98 exceptions to the findings and conclusions and decree nisi, all of which were overruled by the court en banc after argument, and final decree thereupon entered. This appeal followed.

In appellant's notice of questions to be argued on appeal, there are set forth three questions: 1. The question of the effect of the plaintiff's failure to pay or tender dues or report for or about medical supervision or examination, and of the termination of his employment with Abbotts Dairies, Inc., upon his rights to continue sick benefits under the by-laws of defendant Foundation. 2. The question of pertinent physical history and condition of plaintiff and of his rights to continuance of sick benefits. 3. The question of the amount of benefits payable to plaintiff, whether full salary or half salary under the by-laws of defendant Foundation.

We will not undertake to review the 39 assignments of error seriatim. Our principal task consists of examining the entire record with a view to determining whether the findings of the chancellor are sustained by legally competent evidence. For the rule is clear that where the chancellor's findings are affirmed by the court en banc we are concluded thereby, where such findings were supported by proof sufficient to require their submission to the jury in a trial at law: *Belmont Laboratories, Inc. v. Heist et al.*, 300 Pa. 542, 151 A. 15; *Kratz et al. v. Allentown et al.*, 304 Pa. 51, 155 A. 116.

Appellant contends that in June 1938, when benefit payments were stopped, plaintiff was then no longer incapacitated for work, thus ending his right to continuance of benefits without regard to membership.

All of the physicians and all of the medical records in the case indicate clearly that the plaintiff was suffering from tuberculosis continuously from 1935 down to the time of trial. The sole evidence which might indicate that plaintiff was not suffering from tuberculosis was the letter written by Dr. Welty, wherein he stated

that plaintiff's tuberculosis was *completely* arrested. Under Dr. Welty's own testimony, it appeared clearly that the word "completely" in his letter was a stenographic error; that he never intended to say that plaintiff's disease was completely arrested, but only that it was *apparently* arrested; that at most there was an appearance of a quiescent stage of the disease and in no event could he have said that the plaintiff was cured. In view of the testimony by all the doctors who had treated the plaintiff that an attempt to do active work on plaintiff's part in May or June of 1938 would have endangered his health and tended to shorten his life, the finding of the chancellor that plaintiff was incapacitated was sound.

In the case of *Equitable Life Assur. Soc. v. Mac-Kirgan*, 86 F.2271, the court said: "But the weight of authority is that the terms ('disabled from,' 'unable to' or 'prevented from' working) are not intended in that rigid sense, and that one whose work is only trivial or is done under pressure of necessity and at the expense of health or great pain is disabled or unable or prevented from working within the real meaning of the insurance."

In *Pearlman v. Metropolitan Life Insurance Co.*, 336 Pa. 444, 9 A. 2d 432, the plaintiff was the owner of a retail establishment. Taken sick with diabetes and a nervous disorder known as neuro-circulatory asthenia, he was compelled to cease work. For a period of about three months after his disability he was in and about his store for two or three hours a day, mainly upon the recommendation of his physician who thought that a moderate amount of labor might have a beneficial psychological effect. The experiment, however, was unsuccessful. The court, through Mr. Justice STERN, said: "As for the fact that he was able for three months in the spring of 1936 to do at least some work, this represented merely a trial effort suggested by the doctor for therapeutic purposes, and as plaintiff found that he

was obliged to relinquish the attempt this interval in his enforced idleness would not, from a legal standpoint, impair the totality of his disability: *Kramer v. Travelers Insurance Co.*, 111 Pa. Superior Ct. 367, 370; *Eisenhauer v. New York Life Ins. Co.*, 125 Pa. Superior Ct. 403, 406, 407."

In *Eisenhauer v. New York Life Insurance Co.*, 125 Pa. Superior Ct. 403, 189 A. 561, in adhering to the same rule, the court held that the performance of minor acts relating to the business of the plaintiff, done under the advice of his physicians to bring about a restoration of health, could not be clothed with such potency and importance as to constitute "performing any work" "following any occupation" or "engaging in any business." In that case, the insured was supposed to be "wholly" prevented from performing any work. The court was unable to see that the use of the word "wholly" added any greater force than the use of the word "total." While both words mean "completely," they do not mean absolute helplessness, mental and physical. As in that case, the plaintiff here showed sincerity in his efforts to regain his health and continue with his work, although he was not able to do so.

Appellant further contends that plaintiff's employment terminated on June 29, 1938, on terms agreeable to him. The plaintiff testified: "When I came back from Eagleville, I went right away to report to Dr. Tracy. Dr. Tracy examined me, and told me to go home, to come back a month later. I came back a month later. He examined me again. Then I said I would like to go back to work. He said, do you feel all right, I said, I think if I go to work, you know, I won't think about my sickness, and I will be all right. *He said, well, you are not ready yet.* Go home. I went home and then I went to Dr. Welty to be examined." It is clear from this that at this point, the middle of May 1938, neither the plaintiff nor Dr. Tracy considered the plaintiff well and ready to go back to work. There-

after, Dr. Tracy received a letter from Dr. Welty which stated, inter alia, "I believe that this patient's pulmonary tuberculosis is now *completely* arrested and he may return to work whenever you have an available opening for him."

We have already called attention to the testimony of Dr. Welty wherein he stated that the word "completely" was inserted by mistake of his stenographer. We quote further from the testimony of Dr. Welty as to plaintiff's ability to work: "Q. Wasn't the light work, therefore, that you prescribed, or that you suggested, sort of a prescription to determine whether or not he would stand up under it? A. I felt at that time, weighing everything, that the patient probably would stand up, but as I said before return to that much activity is a hazard, always, so if you construe it as that, it is a test ...... Q. If, over a period of a year, from the time of his discharge at Eagleville he did no work, and was home, and then there was a recurrence of the lesion, manifested by a positive sputum, and cavities in the lungs, wouldn't you under these circumstances say that the man, in May, was not capable of doing any work? ......The Witness: In retrospect, I would say he probably should have had more rest......"

Dr. Tracy also testified on the same point, as follows: "Q. Doctor, if you had not gotten a report from the doctor that he was completely arrested, that is, that the disease was completely arrested, but was merely apparently arrested, you would not have sent him off of benefits, would you? A. I would not have taken him off of benefits, if there had been any question that the man had not recovered." Dr. McMurtrie was asked by the chancellor whether the cautionary note about giving the plaintiff light work contained in his letter of May 31, 1938, was "not that a qualification, in your mind, as to Mr. Kahn's ability to return to work?" Dr. McMurtrie answered, "A. That is right, yes, your Honor."

Mr. Schwartz and Mr. Dwyer both admitted that they knew of the doctor's recommendation that it would not be advisable for him to return to the milk wagon.

The minute of the Board meeting of the Foundation helps to show the knowledge of Mr. Kahn's condition. It said: "A recommendation has been made which will be submitted to Mr. Lindback, that the 'Foundation' pay Mr. Kahn one month's salary and ask him to get a position elsewhere, inasmuch as he has been advised not to go back into the milk business by both his own doctor and our medical department." The defendant made this minute in spite of the fact that it now argues that Dr. Welty said he could return to the milk business.

We quote from plaintiff's testimony in relation to this matter: "When I came in to Mr. Schwartz's office he told me to sit down and he said that he had received a letter from Dr. Welty that I am cured. Then he said, well as long as you are cured, we can't use you no more. So I said, what do you mean, you can't use me any more? He said, well, we can't use you any more as long as we brought you back your health. Q. Did you call his attention to what Mr. Lindback had said to you a few days previously? A. Yes, I said Mr. Lindback made me go to get a letter to come back to work. He said, well, I can't help that."

In *Turley v. John Hancock Mutual Life Ins. Co.,* 110 Pa. Superior Ct. 578, 168 A. 356, (affirmed, 315 Pa. 245, 173 A. 163), where the constitution and by-laws of a group insurance plan provided that membership in the association would terminate "upon any member leaving the employ," it was held the word "leaving" must be interpreted as meaning the voluntary act of the employee of quitting the employment and does not contemplate the failure of the employee to report for work by reason of a total and permanent disability. The Supreme Court, in discussing the same case on appeal, said: "Defendant argues that under the terms of the policy and the 'Plan of Protection' any separation from

service for any cause whatever will extinguish any contractual relation, either with the welfare association or with the insurance company. Undoubtedly this contention would be sound had not a member's substantive right prior thereto become fixed. Turley became totally and permanently disabled when he was a member of the association and an employee of the company. He was unable to continue his employment. When that condition arose he became entitled to the benefit from the insurance to be paid to his beneficiary at death. His rights became vested. True, the benefit was not to be enjoyed until death, but his beneficiary was then to receive it. Rights are vested when the right to enjoyment, present or prospective, has become the property of some particular person or persons as a present interest. Turley was not able to work after being disabled, of course; his rights were fixed and determined in 1928 when he was forced to leave this work because of disability. It was not the intent and purpose of the 'Plan of Protection' to oust a man from the association, as well as from the company, who had become permanently disabled after he was 60. The 'Plan of Protection' distinctly says otherwise. Most workmen if they reach 60, become disabled thereafter. The case is very close in reasoning to *Marshall v. Pilots' Assoc.*, 206 Pa. 182, *Becker v. Berlin Beneficial Soc.*, 144 Pa. 232, and *Palmer v. Protected Home Circle*, 252 Pa. 201. In all of these we have held that where rights under similar contracts have become fixed, they cannot be disturbed or destroyed by the subsequent conduct or acts of one of the parties." See also *Lyford v. New England Mutual Life Insurance Co.*, 122 Pa. Superior Ct. 16, 184 A. 469.

It is also contended by appellant that there is no evidence of concert of action between the Foundation and Abbotts Dairies, Inc., to stop benefits to plaintiff. Even a cursory examination of the by-laws of the defendant Foundation will disclose that it is completely,

practically and formally dominated by Abbotts Dairies, Inc. In the first instance, the president of Abbotts Dairies, Inc., appoints the chairman of the board of managers. (Art. III, Sec. 2). That chairman appoints two members of the board of managers who represent the management of Abbotts Dairies, Inc. (Art. III, Sec. 4). The chairman of the board is the chief executive officer of the "Foundation." All committees are directly responsible to him and manifestly he is responsible to the president of Abbotts Dairies, Inc. (Art. III, Sec. 2). Any members of the board who might be appointed from the workers are completely controlled because their relationship with the Foundation can be terminated by the simple expedient of discharging them from their employment. This is the physical connection of the two groups as testified to by the mute by-laws. In the instant case, we find the combination in action with the following significant facts disclosed by the testimony. Dr. Tracy wrote to Dr. Webb saying that the plaintiff is "able to return to work" without mentioning the qualification contained in Dr. Welty's letter. Dr. Webb took action on this letter but Mr. Lindback, who was present at this meeting, told Kahn, "Go back to Dr. Welty and tell him to send us a letter that you are all right and we will put you back to work." Kahn persuaded Dr. Welty to send such a letter. Kahn was then invited to a meeting with Mr. Schwartz, Abbott's Sales Manager, and Mr. Dwyer, the Foundation secretary. At this meeting, Schwartz, in the presence of Mr. Dwyer, told Kahn that he will die within six months if he went back to work on a milk wagon. At this same meeting, Schwartz was told of Mr. Lindback's promise by Kahn, but ignored it completely. At this same meeting, Kahn was handed a check for four weeks' salary. The check was made on the Foundation account even though it was intended as a salary check. The testimony of Mr. Dwyer as to why the check was given from the Foundation is: "Simply

because it was a 'Foundation' matter, so far as I am concerned. I was asked to be there as secretary of the 'Foundation' and to draw the check, as I was instructed by Mr. Schwartz."

The minutes of the board of managers of the Foundation of June 20, 1938, show that they had already decided to pay Kahn off. This decision was to use Foundation funds to pay one month's salary, but only after submission of the plan to Mr. Lindback. It was customary to discuss cases with Mr. Lindback, although he was not an active member of the Foundation. Mr. Lindback himself when asked whether he did not know that the Foundation benefits were ordinarily not stopped until the patient is cured, said: "That is one of the things I am very careful about watching. The policy of the company is to see that a man is paid as long as he is sick." Then there is the letter from Mr. Schwartz to Dr. Tracy stating that the plaintiff had accepted the "decision" favorably. The chancellor heard and saw all the witnesses and was best able to determine from their manner and testimony their credibility. He says in his adjudication: "The chancellor is convinced that an improper, concerted attempt was made by executives of the Foundation and of the Abbotts Dairies, Inc., to take advantage of the plaintiff in order to give the dairies a chance to discharge him and thus improperly to relieve the Foundation of its liability to pay him further benefits."

Appellant attempts to support its refusal to pay benefits after its attempted discharge of plaintiff in June 1938 in that plaintiff failed to perform one of the conditions of the contract of employment. We agree with the court below that appellant must be limited to the two defenses which the Foundation asserted prior to the institution of these proceedings; first, that the plaintiff was no longer incapacitated and was cured; and secondly, that he voluntarily terminated his em-

ployment with Abbotts Dairies, Inc., and hence his Foundation Membership terminated. See *Simons v. Safety Mutual Fire Ins. Co.*, 277 Pa. 200, 120 A. 822; *Engle v. National Council, etc.*, 133 Pa. Superior Ct. 149, 1 A. 2d 798; *Janney v. Scranton Life Ins. Co.*, 315 Pa. 200, 173 A. 819; *Glessner v. Neshannock M. F. L. Co.*, 331 Pa. 439, 1 A. 2d 233. The remarks of the chancellor in his adjudication are most pertinent and fully warranted: "The defendant does not intimate that plaintiff was a malingerer. There is no doubt about the fact that he had tuberculosis. While it is true that plaintiff, as a self-respecting individual, did greatly desire to return to work, it is also established that he was unable to do so and did not work from the date of his illness to the time of trial."

Finally, the defendant now asserts that, if it is liable at all in this case, its liabilities should be limited to one-half the wages. Article XIII, under "Pensions," provides, inter alia, as follows: "Section 1. All members having a Full Beneficial Membership, *who have been in the service of the Company for twenty years shall, at the age of seventy (70), become eligible for pension,* but no pension shall be paid while the member is permitted to remain on the active payroll of the Company.

"Section 2. *Such* members shall also be eligible for pension in cases where accidents or sickness have developed a permanent disablement for service and the accident or illness is the result of hazards incurred in pursuit of duty in service of the Company. Such permanent disability shall be determined by the Medical Director of the Company. If such report shall find the member permanently disabled for any period, he shall be transferred from the sick benefit to the pension list. If the member should recover from such disability the pension shall be discontinued.

"Section 3. Pension rates shall be one-half of the wages or salary earned by the member at the date the pension is awarded, but in no case shall exceed twenty-

five dollars weekly, which sum shall be paid weekly on the same date as the regular of the company."

Irrespective whether these provisions are applicable to the case of plaintiff, there is no evidence that the plaintiff was ever transferred from the sick benefit to the Pension List, in order that the latter might apply. This defense was not raised in the answer to the bill of complaint. Since November of 1935, the plaintiff has been considered as entitled to sick benefits. During the negotiations of June 1938 there was no suggestion that the plaintiff should be placed on the Pension List. The defense has always been that he was not entitled to said benefits. The provisions of this Article are therefore not properly before us for consideration.

After a careful consideration of the entire record, we are of the opinion that the evidence fully sustains the findings and conclusions of the chancellor and confirmed by the court en banc, and that the law has been properly applied.

The objection of the appellant to the order of the court below, recognizing the plaintiff's membership is also without foundation. It is the contention of the plaintiff, adopted by the court below, that the defendant improperly endeavored to terminate plaintiff's membership in order to terminate the benefits due him. The order recognizing plaintiff's status as a member is incidental to the primary prayer—for an order directing the payment of the benefits due.

Appellant should, however, be credited with the amount of the check, $183.40, covering four weeks' salary which was given him at the time of discharge, less four weeks' dues—$1.25 per week or $5. With this modification, the assignments of error are overruled and the decree affirmed. Appellant to pay costs.