## Cameron Estate.

Argued January 7, 1957. Before JONES, C. J., BELL, CHIDSEY, MUSMANNO, ARNOLD and JONES, JJ.

*Thomas D. McBride,* Attorney General, with him *Joseph L. Cohen* and *Lois G. Forer,* Deputies Attorney General, for Commonwealth, appellant.

No argument was made nor brief submitted for appellee.

OPINION BY MR. JUSTICE BENJAMIN R. JONES, March 18, 1957:

The Commonwealth of Pennsylvania has appealed from a decree of the Orphans' Court of Clearfield County which disallowed its claim against the decedent's estate for the reimbursement of public assistance funds allegedly received by decedent.

When Mary E. Cameron died, intestate, April 6, 1952, she left an estate which, according to the final account, had a balance therein of $12,843.20 subject to unpaid disputed claims of $14,182.78.

At audit the learned court below appointed an auditor, inter alia, to pass upon all unpaid and disputed claims including the Commonwealth's claim. After various hearings the auditor found as a fact (Finding

of Fact 67) that there was "due to the Commonwealth of Pennsylvania the sum of $5,733.50 on all of its claims against the deceased" and made an award thereof. Exceptions taken by two of decedent's heirs-at-law to the auditor's report were sustained by the lower court for the assigned reason that the evidence concerning the endorsements of the public assistance checks by decedent was "conflicting". After reargument, these exceptions were reaffirmed by the court for the assigned reason that the auditor "did not have sufficient evidence before him upon which to base his findings of fact."

The present inquiry is whether the evidence was sufficient to sustain the auditor's findings of fact upon which the claim of the Commonwealth was initially allowed. In *Curran's Estate,* 310 Pa. 434, 439, 165 A. 842, 844, the extent of appellate review in this situation is clearly enunciated: where an auditor's findings of fact are overruled by a court and reasons are given for its action, it is the duty of the appellate court to fully and carefully examine such reasons " 'together with the entire record, and determine whether the action of the court in banc is justified, keeping in mind the weight to which the original findings are entitled and also the reasons given for their overthrow': Belmont Laboratories v. Heist, 300 Pa. 542, 548; Pilling v. Moore, 306 Pa. 406, 410". See also: *Mallory's Estate,* 295 Pa. 406, 145 A. 577. Because of his better opportunity to judge of the intelligence and credibility of witnesses and their knowledge of the subject under investigation, an auditor's findings of fact from disputed testimony, while not equivalent to the verdict of a jury or to a Chancellor's findings, are entitled to great weight: *Dingee v. Wood,* 228 Pa. 250, 251, 252, 77 A. 440.

The burden of proving its claim rested upon the Commonwealth. The late Mr. Justice STEARNE, speak-

ing for this court in *Moore Estate,* 349 Pa. 236, 240, 36 A. 2d 812, 814, said: "The measure of proof required to prove a claim against a decedent's estate in the orphans' court is stated in Hirst's Estate, 274 Pa. 286, 288, 117 A. 682: 'A claim against the estate of a decedent must be as definite and precise as is required to recover a debt in an action at law. While formal pleadings are dispensed with, the claimant should produce evidence showing the nature and character of the debt, its origin, the terms of the contract and the exact amount claimed to be due.'" To the same effect: *Deal's Estate,* 321 Pa. 484, 488, 184 A. 453, 454; *Braden Estate,* 363 Pa. 42, 46, 68 A. 2d 734, 736. Cf: *Donlevy's Estate,* 323 Pa. 173, 176, 185 A. 740, 742; *Winsmore's Estate,* 325 Pa. 303, 304, 190 A. 892. A claim can be established against a decedent's estate only by evidence which is clear, direct and positive, or, as is sometimes expressed, clear, precise and indubitable. *Stafford v. Reed,* 363 Pa. 405, 70 A. 2d 345; *Mooney's Estate,* 328 Pa. 273, 194 A. 893.

A clarification of the Commonwealth's claim can be achieved by dividing the claim into four time periods during which the Commonwealth avers it issued public assistance checks to decedent: (1) a claim based on checks issued prior to and including June 25, 1940; (2) a claim based on checks issued from January 27, 1945 to March 28, 1952; (3) a claim based on checks issued from June 25, 1940 to January 27, 1945; and (4) a claim based on checks issued subsequent to April 6, 1952. The checks in the latter classification were issued in the weeks immediately subsequent to decedent's death and were endorsed and cashed, admittedly, by someone other than decedent, and for the amount of these checks the Commonwealth seeks no reimbursement.

We will consider the evidence concerning the claims during each of the three other time periods.

## A.
### Checks Issued Prior To June 25, 1940.

It is conceded that during this period public assistance checks payable to decedent in the amount of $644.50 were issued, that the decedent actually endorsed and received the proceeds of such checks and this portion of the Commonwealth's claim has been established beyond doubt.

## B.
### Checks Issued From January 27, 1945 To March 28, 1952.

The evidence indicates that during this period the Commonwealth issued checks totalling $3,571.60 payable to Mary E. Cameron. It is admitted that ten of these checks, representing a total sum of $222.00, were endorsed by a person other than decedent and that the Commonwealth's claim for reimbursement during this period should be reduced to $3,349.60.

In support of its claim the Commonwealth produced six witnesses, including two handwriting experts. The testimony of these witnesses, summarized, was as follows:

(1) James Patterson, Principal Claims Settlement Agent, described the method of keeping public assistance records and the manner of issuance of checks; the official records in his possession indicated that checks were mailed to Mary Cameron regularly from January 7, 1945 to March 28, 1952; among the official records in his possession were two applications for assistance executed by Mary Cameron on February 14, 1938 and May 24, 1940 respectively:

(2) R. W. Feitshans, Comptroller of Records in the DPA Pittsburgh regional office, testified that three separate Commonwealth departments were re-

sponsible for the accuracy of public assistance expenditures and for checks issued in connection therewith and that the records in his possession indicated a notification on June 25, 1942 that Mary Cameron had moved from 1408 Sedgwick Street to 3358 Fifth Avenue, Pittsburgh; further, the records indicated that checks were issued payable to decedent continuously from June 25, 1940 to June 13, 1952:

(3)   Pearl Noechel, a DPA visitor, testified that on four occasions—October 29, 1941, January 28, 1942, February 13, 1942 and May 12, 1942—she visited Mary Cameron's home but on these occasions did not talk with Mary Cameron although on several of these occasions she conversed with a Mrs. Anthony (later identified as decedent's sister); on the occasion of her last visit the witness was informed that the Cameron family had moved to DuBois; at the Pittsburgh DPA district office the witness conversed for the first and only time with a woman who identified herself as Mary Cameron who was then at the office to report a change in her address; this witness identified Mary Cameron on a photograph (an identification later confirmed by exceptants' witness, Mrs. Bolam) and Mrs. Anthony in another photograph (an identification later contradicted by Mrs. Bolam):

(4)   Alfred Morasco, a former DPA visitor, testified not from his recollection but solely from the official records which indicated that he had seen Mary Cameron at her home on four occasions—September 11, 1944, June 20, 1945, January 20, 1947 and March 17, 1948—and at the Pittsburgh district office on March 25, 1948; he identified Mary Cameron in a photograph and identified her handwriting on a public assistance form executed March 25, 1948:

(5)   Rudolph Hardt, Head Teller of the Allegheny Trust Company, Pittsburgh, Pa., testified that Mary

Cameron opened a bank account in his institution on February 3, 1922, giving as her address 909 Progress Street, Pittsburgh, Pa.; that on November 14, 1930 she noted for the bank records a change of address to 1518 Buena Vista Street, Pittsburgh, Pa., and closed her account on March 9, 1939; he knew Mary Cameron, had cashed checks for her and recalled several occasions upon which she had appeared personally and received the check proceeds; he identified ten checks issued during the period from June 27, 1947 to February 28, 1952 as having been cashed by him; he identified Mary Cameron's signature on the signature card in connection with her bank account and testified that the signatures on the checks were the same as the signature on the signature card; he was unable to state that he saw Mary Cameron cash any assistance checks between March 19, 1939 and June, 1947; after comparing signatures of Mary Cameron on checks issued in 1937 and 1938 payable to John Cameron and reendorsed by Mary Cameron with signatures of Mary Cameron on ten checks issued from June 27, 1947 to February 28, 1952 he noted a change in the handwriting style in connection with four letters—"C", "M", "y" and "r"; conceding this change in handwriting style between 1938 and 1952, he nevertheless testified that in his opinion the signatures on the checks issued during this period were Mary Cameron's signatures:

(6) Lt. Stanley S. Smith, Document Examiner for the Pennsylvania State Police, testified that after an examination and comparison of genuine signatures of the decedent with the disputed endorsements on these checks, it was his opinion that the signatures in both instances were written by the same person with the exception of ten checks which bore endorsements by Mary Cameron which in his opinion were spurious and probably written by one Jean Greco.

In opposition to the Commonwealth's claim three witnesses, one a handwriting expert, testified. Their testimony, summarized, was as follows:

(1) Daniel B. Kiel, Treasurer and Director of Union Banking and Trust Company, DuBois, Pa., testified that the decedent opened a check account in that bank in 1935; he was acquainted with decedent from that time until her death and he identified her signature not only on the bank signature card but also on a mortgage and certain notes; that over the years decedent's signature did vary in the letters "y" and "m"; that in his opinion the endorsements on the disputed checks were not endorsements made by decedent; notices sent by the bank in reference to decedent's mortgage went to 3358 Fifth Avenue, Pittsburgh, Pa., while notices concerning decedent's notes in the bank were sent sometimes to the same address but generally to an address on Main Street, DuBois, Pa.; the witness was aware that decedent had had an address on Sedgwick Street in Pittsburgh and that she was continuously back and forth between Pittsburgh and DuBois; from what he could observe decedent was apparently always in need of money:

(2) Elizabeth Bolam, herself a claimant, stated that from November 19, 1947 until her death Mary Cameron lived continuously in DuBois, Pa.; the witness talked daily with the decedent and maintained a diary; whenever decedent would go out of town the witness would take her to the bus station and such fact would be noted in her diary; inasmuch as her diary contained no notation of a trip by decedent to Pittsburgh on or about March 17, 1948 the witness concluded that decedent was not in Pittsburgh at that time, hence the Commonwealth's witness Morasco could not have talked to decedent at that time, as he had testified; the witness kept the key to decedent's mail-

box, checked her mail, never saw any assistance checks in the mailbox; she did acknowledge that decedent had little money and received only $55.00 a month from other sources; she corroborated the Commonwealth's witnesses, Mrs. Noechel and Mr. Morasco in their identification of decedent on the one photograph but contradicted Mrs. Noechel who pointed out a person on another photograph as Mrs. Anthony whereas it was actually decedent:

(3) Pearl Parris, decedent's friend for approximately fifty years, testified that Elizabeth Bolam cared for decedent during an illness which lasted from April 30 to June 8, 1949, and that Mrs. Bolam had the key to decedent's mailbox.

We are of the opinion that the evidence produced by the Commonwealth was sufficient to support its claim.

Prior to the period covered by these checks admittedly decedent was the recipient of public assistance, and, under the testimony of two witnesses for the exceptants, decedent was always in need of money, her income being very meager. The likelihood that decedent continued during this period of time to receive public assistance was established. That decedent lived not only in DuBois but at times on Sedgwick Street and Fifth Avenue in Pittsburgh was established by the Commonwealth and corroborated by Mr. Kiel, exceptants' witness. Two Commonwealth witnesses identified decedent in a photograph as the person who visited the DPA district office in Pittsburgh to note a change in her address.

The official records kept in the regular course of business by the Department of Public Assistance establish that during this period checks were regularly mailed to a Mary Cameron. In *Higgins Lumber Co. v. Marucca et al.*, 159 Pa. Superior Ct. 405, 407, 48

A. 2d 48, 49, it was said: "Depositing in the post office a properly addressed, prepaid letter raises a presumption that it reached its destination by due course of mail, and mailing a letter in such way is prima facie evidence that it was received by the person to whom it was addressed. Whitmore v. Dwellinghouse Insurance Co., 148 Pa. 405, 23 A. 1131; Jensen v. McCorkell, 154 Pa. 323, 26 A. 366." See also: *Beeman v. Supreme Lodge, Shield of Honor,* 215 Pa. 627, 64 A. 792, 793; *Fox et al. v. Davey Compressor Company,* 318 Pa. 331, 334, 178 A. 469, 470. The Commonwealth was entitled to the benefit of this presumption inasmuch as its records indicated an appropriate mailing of checks during this period.

Two handwriting experts, whose qualifications were not challenged, testified that in their opinion the endorsements on the checks issued during this period were genuine signatures of the decedent. Moreover, it seems incredible that decedent would visit the DPA district office to note a change of address if she were not the recipient of assistance or if decedent was not receiving her assistance checks that she would not have made a complaint over this period of time. The opinion of the handwriting experts supported by other facts and circumstances gives great weight to the strength of the Commonwealth's case.

While we consider in our review only the strength, if any, of the claimant's evidence and not the weakness, if any, of the exceptants, it is well to note that the opposition to the Commonwealth's claim is based principally, if not solely, on the opinion of a handwriting expert who testified in effect that the endorsements on these checks were forged. Particularly applicable to this situation is the language of this court in *Snedeker Estate,* 368 Pa. 607, 609, 84 A. 2d 568, 569: "Opinion evidence by an expert is, of course, admissi-

ble but as we said in Henry's Estate, 276 Pa. 511, 513, 120 A. 454, 'opinion evidence, standing alone, as it did, would not sustain a finding of forgery, in the face of the direct and credible evidence . . . Were the direct evidence discredited, or the opinion evidence strengthened by facts and circumstances, the case might be different.' "

An analysis of the record indicates that the evidence produced on behalf of the Commonwealth was sufficient to justify a finding that the Commonwealth was entitled to be reimbursed for money advanced to the decedent during this period.

C.

### Checks Issued From June 25, 1940 To January 27, 1945.

James Patterson, Principal Claims Settlement Agent, testified that the official records in the Department of Public Assistance Regional Office in Pittsburgh indicated checks were regularly issued to a Mary Cameron from June 25, 1940 to January 27, 1945 but that the cancelled checks issued during this period could not be produced due to the impossibility of isolating such checks from other checks and records which were in storage.

The only difference between the proof presented by the Commonwealth in connection with checks issued during this period and the period subsequent to January 27, 1945 lies in the fact that the Commonwealth was unable to produce the cancelled checks and endorsements thereon.

We are satisfied that the failure to produce these checks arises from the fact that the Commonwealth in the field of public assistance is confronted with a serious problem of storage of a large amount of records with the resulting difficulty of locating any particular records among the stored material. We are

satisfied that the Commonwealth made a thorough and diligent search for these cancelled checks and that the only reason for their non-production was the impossibility of locating them among the vast amount of stored material. Cf: *Greggerson's Estate,* 344 Pa. 498, 25 A. 2d 711.

The official records produced by the Commonwealth indicated that checks were regularly issued during this period to Mary Cameron. It is a well established exception to the "hearsay rule" that book entries, made in books of original entry, are admissible against a deceased debtor: *Engemann v. Colonial Trust Co.,* 378 Pa. 92, 101, 105 A. 2d 347, 352. The records introduced by the Commonwealth were not the records of a private company but were official records prepared in the ordinary course of business by officials of the Commonwealth of Pennsylvania. Such records carry with them a presumption that they are valid and correct and that the official acts involved in their preparation have been properly performed: *Vernon Township et al. v. United Natural Gas Co.,* 256 Pa. 435, 439, 100 A. 1007, 1008; *Fleming et al. v. Adamson et al.,* 321 Pa. 28, 37, 182 A. 518, 522; *Tremont Township School District Appeal,* 366 Pa. 404, 409, 77 A. 2d 403, 406; *Beacom v. Robison et ux.,* 157 Pa. Superior Ct. 515, 521, 43 A. 2d 640, 643; 31 C. J. S., Evidence §146.

To exceptants' argument that because the Commonwealth admitted that endorsements of Mary Cameron on some checks issued during other time periods were forged, therefore, the Commonwealth's claim should not be allowed for this period because of the possibility that the endorsements on some of the non-located checks might also have been forged, the auditor in his report makes a complete and logical answer: "In answer to this it should be pointed out that the lost

checks cover the period from January 25, 1940, to January 27, 1945, while the first admittedly forged endorsement was not uttered until June 13, 1951, some 6½ years later. It seems to the Auditor that if there was any pattern of forgeries in any endorsements on the lost checks, it would be more than strange that it should stop abruptly for a period of 6½ years and then be resumed to the extent that ten checks bore forged endorsements in a period of less than one year after June 13, 1951. The Auditor can find no merit in this argument." (Rec. 136a, 137a)

The testimony of the Commonwealth's four lay witnesses considered in conjunction with the official records constituted sufficient evidence to justify the auditor in allowing the Commonwealth's claim during this period.

The exceptants challenged four of the auditor's findings of fact: "(1) To finding of fact No. 64 which reads as follows: Public Assistance checks totalling $5311.00 were issued by the Commonwealth to Mary Cameron during the period from July 25, 1940 to March 28, 1952 (Commonwealth's Exhibit No. 5). (2) To Finding of Fact No. 65 which reads as follows: the endorsements on the checks in the group issued from January 27th, 1945 to and including March 28, 1952 are the signatures of Mary Cameron. (3) To Finding of Fact No. 66 which reads as follows: Mary Cameron received the funds represented by Public Assistance checks issued during the period from July 25, 1940 to March 28, 1952 except for the funds represented by the checks as set forth in Finding of Facts No. 63. (4) To Finding of Fact No. 67 which reads as follows: there is due to the Commonwealth of Pennsylvania the sum of $5733.50, on all of its claims against the decedent." (Rec. 122a)

In its first opinion the learned Court below affirmed these exceptions upon the ground that the "evidence is conflicting". In its second opinion the lower Court reaffirmed its previous order upon the ground that "the auditor in making his findings, particularly of facts Nos. 64 and 65, did not have sufficient evidence upon which to base those findings." In our opinion there was sufficient evidence upon which to base the auditor's findings of facts 64 to 67 inclusive and the lower Court erred in finding to the contrary.

The order of the lower Court reaffirming the exceptions and disallowing the Commonwealth's claim is reversed. Costs are to be paid by the estate.

Mr. Justice ARNOLD dissents.